72　155
153　256

## Kirkpatrick & Lyons *versus* Bonsall.

1. In consideration of $1000, the defendants, November 10th 1870, agreed to deliver to plaintiff 5000 barrels of oil at any time within the first six months of 1871. "If this oil is called for, this call becomes a contract, ten days' notice shall be given, and (the plaintiff) or his assigns agree to receive and pay for the same cash on delivery, at $10\frac{1}{2}$ cents per gallon," &c. *Held*, not to be on its face a gambling contract.

2. A bargain for such an option may be legitimate, but its character may be weighed in connection with other evidence, on the question whether the transaction was a gambling scheme.

3. The plaintiff was not a refiner nor a purchaser for his own consumption, and gave notice of his option before he had sold; he had not intended to call, if the oil had gone below the price in the contract. *Held*, that it was proper to ask plaintiff what contracts he had, when he entered into this contract, maturing prior to 1st of January 1871, to be followed by evidence of his financial inability to take and pay for the amount of oil specified in said contracts.

October 16th 1872. Before Thompson, C. J., Read, Agnew, Sharswood and Williams, JJ.

Error to the Court of Common Pleas of *Allegheny county* : Of October and November Term 1872, No. 115.

Sterling Bonsall, on the 30th of June 1871, commenced an action of assumpsit against Joseph Kirkpatrick and James Lyons, trading as Kirkpatrick & Lyons, for breach of a contract by the defendants to sell the plaintiff 5000 barrels of petroleum.

The case was tried April 2d 1872, before Collier, J.   The plaintiff gave in evidence the contract, viz. :—

"For and in consideration of the sum of $1000 to us in hand paid by Sterling Bonsall, Esq., the receipt of which is hereby acknowledged, we hereby bind and obligate ourselves to deliver to said Sterling Bonsall, or his assigns, should he, or they, call upon us to do so at any time during the first six months of 1871, five thousand barrels of good green merchantable crude petroleum, forty gallons to the barrel, gravity 40° to 46°, at a temperature of 60° Fahrenheit, either in bulk cars or bulk boats, at Pittsburg, Pa.   If delivered by A. V. R. R., or W. P. R. R., buyers may designate any point of delivery on line of said roads, or any good landing on the Allegheny river, near Pittsburg, if delivered by bulk boats.   If said oil is called for, this call becomes a contract, ten days' notice shall be given, and said Sterling Bonsall, or his assigns, hereby agree to receive and pay for same, cash on delivery, at the rate of ten and a half cents per gallon on lots as gauged and delivered.

" One-half per cent. brokerage whether oil is delivered or not.

KIRKPATRICK & LYONS.

Nov. 15th 1870."

Also notice as follows :—

June 8th 1871.

" Messrs. Kirkpatrick & Lyons:

" Gentlemen :—Please take notice that I hold a contract with you, to deliver to me five thousand barrels of good green merchantable crude petroleum, forty gallons to the barrel, gravity 40° to 46° degrees Fahrenheit, which you have by contract, dated November 15th 1870, agreed to deliver to me if called upon by me to do so, at any time during the first six months of 1871; either in bulk cars or bulk boats, at Pittsburg, Pa.   I by this call upon you to deliver to me the said oil on the twenty-sixth day of June, A. D. 1871, according to your contract, a copy of which I annex to this call.

" I will pay you cash for said oil on delivery.

Respectfully yours,

STERLING BONSALL."

Plaintiff gave evidence of a tender on the 26th of June 1871, by him to Lyons, one of the defendants, of $21,000, for 5000 barrels of oil at 10½ cents per gallon, a demand for delivery of the oil and refusal by defendants to deliver.

The defendants then called the plaintiff, who testified :—

" Am plaintiff; was not a refiner when I entered into this contract; had no other contract at this time; had five call contracts for 5000 barrels of oil during this period.   Had buyer's option contract.   All my contracts would amount to 40,000 barrels.

[Kirkpatrick *v.* Bonsall.]

It would require $168,000 to pay the oil. All my contracts matured from the 13th to the last of June. I had the $168,000 within my control, but not in cash. Had not sold the oil when I made up my mind to *call.* Not in the refining business, but am in the producing business. The Messrs. Gallagher were my agents here. Some of the tenders I made myself. $42,000 in cash I had here. I would not have called them if the market price had not been below ten cents, unless after I made the call—then I would have taken them at any price."

The defendants proposed to ask the witness what contracts he had at the time he entered into this contract, maturing prior to 1st of January 1871; for the purpose of showing the magnitude of the plaintiff's undertaking, in way of purchase of oil, to be followed by evidence of his financial inability to take and pay for the amount of oil specified in said contracts.

This was objected to by the plaintiff, as not of the time of the transaction, and can throw no light on the issue.

The offer was rejected and a bill of exceptions sealed.

On cross-examination he said :—

" Am a dealer and producer of oil; been since 1864; did not settle any differences; was prepared to take the 25,000 barrels in June, and pay for them ; there was no agreement to settle on differences, there certainly was none on mine. I bought the oil, and intended and expected, when I made the calls, to get the oil and not the differences. I made arrangements for $105,000 with the bank here. The buyer's option contracts had been already refused, and I needed no money for them."

The evidence being closed, the defendants' counsel requested the court to charge the jury, that the plaintiff could not recover upon the contract sued upon.

This the court refused, and charged that the plaintiff was entitled to recover.

The verdict was for the plaintiff for $5492.37.

The defendants removed the record to the Supreme Court and there assigned for error, the refusal of their offer of evidence and the instruction to the jury.

*S. Schoyer,* Jr., for plaintiffs in error.—The contract on its face was wagering. The $1000 was a premium as for insuring plaintiff the oil in a given time, and there was no insurable interest: Paterson *v.* Powell, 9 Bing. 320; Pritchet *v.* Insurance Co., 3 Yeates 464; Hall *v.* Berger, 19 Barb. 122; Brua's Appeal, 5 P. F. Smith 294.

*D. W. Sellers* (with whom was *T. J. Keenan*), for defendant in error, cited Smith *v.* Bouvier, 20 P. F. Smith 325.

[Kirkpatrick *v.* Bonsall.]

The opinion of the court was delivered, October 21st 1872, by

AGNEW, J.—We cannot pronounce this agreement a gambling contract on the face of the writing. A bargain for an option, such as it presents, may be legitimate, and for a proper business object. We can imagine such cases. But it is evident such agreements can be readily prostituted to the worst kind of gambling ventures, and therefore its character may be weighed by a jury in connection with other facts in considering whether the bargain was a mere scheme to gamble upon the chance of prices. The form of the venture when aided by evidence may clearly indicate a purpose to wager upon a rise or fall in the price of oil at a future day, and not to deal in the article as men usually do in that business. We must not confound gambling, whether it be in corporation stocks or merchandise, with what is commonly termed speculation. Merchants speculate upon the future prices of that in which they deal, and buy and sell accordingly. In other words they think of and weigh, that is speculate upon, the probabilities of the coming market, and act upon this lookout into the future, in their business transactions; and in this they often exhibit high mental grasp, and great knowledge of business, and of the affairs of the world. Their speculations display talent and forecast, but they act upon their conclusions and buy or sell in a bonâ fide way. Such speculation cannot be denounced. But when ventures are made upon the turn of prices alone, with no bonâ fide intent to deal in the article, but merely to risk the difference between the rise and fall of the price at a given time, the case is changed. The purpose then is not to deal in the article, but to stake upon the rise or fall of its price. No money or capital is invested in the purchase, but so much only is required as will cover the difference—a margin, as it is figuratively termed. Then the bargain represents not a transfer of property, but a mere stake or wager upon its future price. The difference requires the ownership of only a few hundreds or thousands of dollars, while the capital to complete an actual purchase or sale may be hundreds of thousands or millions. Hence ventures upon prices invite men of small means to enter into transactions far beyond their capital, which they do not intend to fulfil, and thus the apparent business in the particular trade is inflated and unreal, and like a bubble needs only to be pricked to disappear; often carrying down the bonâ fide dealer in its collapse. Worse even than this, it tempts men of large capital to make bargains of stupendous proportions, and then to manipulate the market to produce the desired price. This, in the language of gambling speculation, is making a corner—that is to say, the article is so engrossed or manipulated as to make it scarce or plenty in the market at the will of the gamblers, and then to place its price within their power. Such transactions are destructive of good morals and fair dealing, and of the best interests of the community.

[Kirkpatrick v. Bonsall.]

If the article be stocks, corporations are crushed and innocent stockholders ruined to enable the gambler in its price to accomplish his ends. If it be merchandise, e. g. grain, the poor are robbed, and misery engendered.

These remarks perhaps contain nothing new, but they are made to show how a contract, legal on its face, may become an instrument of illegal and ruinous schemes, injurious to the community and contrary to the highest policy of the state. The illegal purpose is therefore a fact falling within the province of the jury, and when found by them, brings the contract under the ban of the law. If this purpose or intent be nothing but to wager on the rise or fall in the price of an article, and not to deal in it bonâ fide, the law must pronounce the bargain a gambling contract. This brings us to consider the defendants' offer of evidence which the court refused.

Every offer of testimony is to be judged of by the court upon the state of the evidence already in, or of that with which the offer is proposed to be followed. How then did this case stand when the offer was made ? The plaintiff had given in evidence a written agreement; not illegal, it is true, on its face, but of that kind used in gambling ventures. The defendants had shown by the plaintiff's own testimony that he was not a refiner of oil, or one who would buy for his own consumption—that he had not sold the oil when he made use of his call or option, and therefore had no contract of his own to fulfil—and also that he did not intend to call for the oil if the market price had gone below the price fixed in the agreement. What intent would reasonably be inferred from these circumstances? Certainly the belief induced that there was not an intent to bargain for oil for a real business purpose. Now if besides this contract it could be shown that many others of a similar kind were entered into by the same man, at and about the same time, certainly it would strenghten the conviction that the plaintiff was not a bonâ fide contractor in a legitimate business; and if we then add to this the fact that he was financially unable to take and pay for the total amount of oil he had contracted for, that conviction would become more firm, and that the real nature of his contracts was a wager on the rise and fall of the price of oil. The offer went therefore to the very question whether he was gambling in the price of oil. The objection to the offer that it was not of the time of the transaction is not tenable, for this agreement bears date the 15th of November 1870, and the contracts offered to be shown were those to mature on or prior to the 1st day of January 1871. They were therefore not too distant in time to have no bearing upon the character of the contract in question. The objection that these contracts would throw no light on the issue is plainly not valid, for the similarity of the contracts and the proximity of time considered with

[Kirkpatrick *v.* Bonsall.]

the financial inability of the plaintiff to fulfil them all, are not slight evidence merely of the wagering intent. It is no good answer that the plaintiff had stated his ability to control the means of performing his contract, for the defendants were not bound by his statement. According to the second section of the Act of 15th April 1869 (Brightly's Purd. 1566, pl. 2), a party to the record in a civil proceeding may be examined as if under cross-examination, at the instance of the adverse party, who is not to be concluded thereby but may rebut by counter testimony. Had the evidence been received, and the jury been satisfied of the truth of it, the case presents that of a man not engaged in the oil business proper, bargaining for an immense quantity of oil far beyond his ability to pay for, with no intent to consume, use or sell it, entering into a similar contract precisely adapted to a wager on the price, and with no intent to call for a delivery of the oil unless the chances of the price fell out in his favor. This presented a question of fact for the jury, and not merely the legal interpretation of the paper on its face, as a wagering contract. The rejection of the offer was therefore error.

Judgment reversed, and a *venire facias de novo* awarded.