(126 So. 637)

SOUTH CAROLINA COTTON GROWERS' CO-OP. ASS'N v. WEIL et al.

3 Div. 833.

Supreme Court of Alabama.

Dec. 19, 1929.

Rehearing Denied March 20, 1930.

Weil, Stakely & Cater and Hill, Hill, Whiting, Thomas & Rives, all of Montgomery, for appellees.

McDonald & McDonald, of Winnsboro, S. C., and Elliott & McLain, of Columbia, S. C., and Ball & Ball, of Montgomery, for appellant.

## BROWN, J.

This action is assumpsit by appellant against appellees to recover an amount alleged to be due on the purchase price of a large quantity of cotton, purchased by the defendants from the plaintiff in five separate transactions or contracts.

The complaint consists of the common counts, and special counts relating to each of the several transactions. The pleas were the general issue, payment, and accord and satisfaction.

The record is voluminous, consisting of approximately two thousand pages, and on this record appellant has made three hundred and forty assignments of error.

Our examination of the case, however, has been rendered less burdensome by the able argument and briefs of the parties, limiting consideration to questions of law arising from the refusal of special charges requested by the appellant, and the giving of the affirmative charge for the defendants.

The plaintiff is a corporation organized and existing under the Act of the General Assembly of the State of South Carolina, approved March 29th, 1921, entitled "An Act to Promote and Further Co-operative Marketing." Acts 1921, No. 203 (32 St. at Large, p. 339).

Section 6 of the act provides:

"*Powers of Incorporated Associations.*— Each association incorporated under this Act shall have the following powers:

"(a) To engage in any activity in connection with the marketing, selling, harvesting, preserving, drying, processing, canning, packing, storing, handling or utilization of any agricultural products produced or delivered to it by its members; or the manufacturing or marketing of the by-products thereof; or in connection with the purchase, hiring or use by its members of supplies, machinery or equipment; or in the financing of any such activities, or in any one or more of the activities specified in this section. No association, however, shall handle the agricultural products of any non-member, except by special rules and regulations.

"(b) To borrow money and to make advances to members.

"(c) To act as agent or representative of any member or members in any of the above mentioned activities.

"(d) To purchase or otherwise acquire, and to hold, own, and exercise all rights of ownership in, and to sell, transfer, or pledge shares of the capital stock or bonds of any corporation or association engaged in any related activity or in the handling or marketing of any of the products handled by the association.

"(e) To establish reserves and to invest the funds thereof in bonds or such other property as may be provided in the by-laws.

"(f) To buy, hold and exercise all privileges of ownership, over such real or personal property as may be necessary or convenient for the conducting and operation of any of the business of the association or incidental thereto.

"(g) To do each and everything necessary, suitable or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the objects herein enumerated; or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged; and in addition, any other rights, powers and privileges granted by the laws of this State to ordinary corporations, except such as are inconsistent with the express provisions of this Act; and to do any such thing anywhere."

The stated purposes for which the incorporation is formed, among others, are:

"(a) To promote, foster and encourage the business of marketing cotton and cotton seed cooperatively; *to minimize speculation and waste in* the production and *marketing* of cotton and cotton seed and their products; *to stabilize cotton markets;* to handle cooperatively and collectively the problems of cotton growers;

"(b) To engage in any activity in connection with the grading, handling, processing, treating, storing, shipping, warehousing and marketing of cotton and cotton products of the association and of its members; and in the financing of any of said operations;

"(c) *To purchase and sell any cotton* or cotton products *of its members,*" etc.   *   *   *

"(k) *To do each and everything necessary, suitable or proper, in the judgment of the Directors of this Association, anywhere throughout the world, for the accomplishment of any of the purposes or attainment of any one or more of the objects herein enumerated,* or which shall at any time appear conducive to or expedient for the interests or benefit of the Association and the members thereof and to contract accordingly.   *   *   *"

"(*l*) *The operations and activities* of this Association *shall be limited* to activities arising out of the processing, treating, grading,

manufacturing, *shipping, storing, warehousing, handling and marketing of cotton* or cotton products, or cotton seed or cotton seed products, *of the Association and of its members only* and to the financing of any of the said operations;

"The Association shall not be permitted to buy or sell cotton or cotton seed *except from and for its members only and on a standard cooperative basis. It shall not buy* or handle any cotton or cotton seed whatsoever from non members; or *to be permitted to go in the open market to buy cotton* or any cotton products, or cotton seed or cotton seed products whatsoever:

"(m) The Association shall be expressly forbidden to do anything with the intent or effect of lessening the production or use or consumption of cotton or cotton seed; but *this Association shall do everything within its power to prevent speculation in the handling of cotton* and cotton products and cotton seed and cotton seed products *and to secure for its members a fair price for their cotton* or cotton products in the market of world; and do everything reasonable within its power to stabilize to a fair level downward the prices to be paid by the ultimate consumers; to increase the sale, use and consumption of cotton and cotton products by all possible commercial and merchandising methods; and to use every possible means to improve the supply and to extend and increase the demand for cotton and cotton products and cotton seed and cotton seed products;

"(n) This Association shall have and exercise all powers, privileges and rights authorized by the laws of this State and all powers and rights incident thereto."

The corporation is managed by a board of not less than five directors, "elected by the members or stockholders from their own members," and this board is authorized to "elect from their members a president, one or more vice presidents and a secretary and treasurer."

The defendants are cotton merchants engaged extensively in buying and selling spot cotton, with their principal office and place of business in Montgomery, Ala., and maintain offices and warehouses in Columbus and Savannah Ga., and an office in New York.

The several different contracts of sale, out of which the controversy between the plaintiff and defendants arose, are similar in import and legal effect, and the statement of one of the transactions is deemed sufficient to develop the principles of law applicable.

The record shows that the board of directors of the plaintiff consists of eleven members, and what is referred to in the proceedings of the board as "the management" consists of the sales manager, his assistants, and the office manager. By resolution of the

board of directors, adopted April 9, 1923, "the management" was given "carte blanche authority to sell cotton."

On May 15, 1923, Arthur Mazyck was re-elected sales manager, and James L. Respess was elected office manager. On September 12, 1923, a resolution was adopted by the board of directors authorizing the management "to sell cotton from time to time as it sees fit, *with power to sell on call.*"

After negotiations conducted by the plaintiff's sales manager, by wire in its name, the defendants mailed to the plaintiff the following:

"Purchase and Sales Memorandum from Weil Brothers.

"Duplicate.

"October 16, 1923.

"South Carolina Cotton Growers' Cooperative Association., Columbia, S. C.

"Dear Sir: We beg to confirm purchase today, as follows:

| | |
|---|---|
| Number bales, | 2,000 b/c (Two Thousand Bales) |
| Grade, | 1,000 b/c Strict Mid., 1000 b/c Good Middling. |
| Growth and Staple, | 7/8" to 1". |
| Price Per Pound, | St. Middling at 60 points on Dec. N. Y. on call.<br>Gd. Middling at 100 points on Dec. N. Y. on call. |
| Freight paid to, | Shipside, high density Savannah. |
| Shipment Time, | First half of November. |
| Reimbursement, | Payment against documents. |
| Terms, | Seller's call on or before shipment. |

"Remarks, Grades, weight, and staple to be determined in Savannah. We to patch in Columbia and to deduct amount of patching from reweight at Savannah. When ready to fix price sell Decembers for our account thru our New York office, (Weil Brothers, Cotton Exchange Bldg. New York, N. Y.) Advise when ready to ship and we will send instructions."

This confirmation was signed by the defendant and "accepted" by the plaintiff, "S. C. Cotton Growers Cooperative Assn., Arthur Mazyck, Sales Mgr., by W. J. Duncan, Jr."

During the latter part of October, 1923, the plaintiff began to ship cotton covered by the contract above stated, in lots of 100 bales or more, making drafts on the defendants with bills of lading attached, calling for a provisional advancement on the price, approximately 2 cents per pound under the then market price of cotton, and, when these drafts were presented for payment, it was agreed

between the parties, the plaintiff acting through its sales manager, and the defendants through their agents, Barnes, and Weil, a member of the defendants' firm, that the drafts could be made for such provisional payments as the cotton was shipped; that plaintiff could make calls before or after delivery, and could transfer the calls from month to month during the season, the parties mutually agreeing to margin against the fluctuation in the price of cotton on the market, pending the right of plaintiff to definitely fix the price by calling for settlement. That is, if the price advanced more than 2 cents per pound, defendants were to put up with the plaintiff an additional sum to bring the provisional advancement up to within the agreed level under the market price. If the market price receded, plaintiff returned such amount as would reduce the provisional payment to the agreed level.

Under this arrangement the plaintiff, acting through Mazyck, its general sales manager, exercised the right to transfer the call, as to some of the cotton, because of the decline in the market, from month to month, up to the July call, 1924, and during the month of June a final call for settlement was made, resulting in a settlement between the parties on the basis of the price of cotton on the New York Exchange, on the date of the call. On this basis, taking into account the provisions of the contract, as modified, as to the points to be added to the call price of cotton on the exchange, defendants furnished plaintiff statement showing balance due, with check to cover, which was indorsed and collected by the plaintiff and the money retained.

Some time thereafter this suit was filed, and plaintiff concedes the validity of the original contracts, except as to the stipulation for a fixation of the ultimate price. As to this the contention is made that the stipulation for fixing the price and the alleged modifications stipulating for transferring or switching the time for call on the contracts from month to month were mere gambling transactions, and, plaintiff not having exercised the right to fix the price of the cotton before its delivery, it was entitled to a settlement on the quantum valebant, at the time of delivery.

To constitute a valid, enforceable, executory contract of sale of personalty, the fixation of the price of the commodity is an essential element. It is not necessary, however, that the price be definitely fixed at the time the contract is entered into, if the agreement contains express or implied provisions by which it may be made certain. Francis-Chenoweth Hardware Co. v. Gray, 104 Ala. 236, 15 So. 911, 53 Am. St. Rep. 37; Shealy & Finn v. Edwards, 73 Ala. 175, 49 Am. Rep. 43; 23 R. C. L. 1277, § 94.

And the parties may stipulate for the fixation of the price on a future event relevant to the transaction in which the parties are interested. Williston on Sales (2d Ed.) § 169.

As illustrative of the principle, and the relevancy of the contingency to the subject-matter of the contract, Professor Williston cites Ferguson v. Coleman, 3 Rich. Law (S. C.) 99, 45 Am. Dec. 761, wherein the buyer of land promised to pay as the price $902.58, if cotton should rise to 8 cents by November 1st, and, if not, to pay $500. The court there held plaintiff entitled to recover the larger sum on proof that cotton had risen by November 1st to over 8 cents, observing "the objection to the agreement that it is a wager is plainly inapplicable, for the parties had an interest in the contingency. The defendant purchased the land at the lower price incidentally, but contracted to pay a larger sum if the value should enhance by the increase of value of the product;" and other decisions sustaining the proposition. Newell v. Smith, 53 Conn. 72, 3 A. 674; Plumb v. Campbell, 129 Ill. 101, 18 N. E. 790; Wolf v. National Bank of Ill., 178 Ill. 85, 52 N. E. 896; Phillips v. Gifford, 104 Iowa, 458, 73 N. W. 1033; Deyo v. Hammond, 102 Mich. 122, 60 N. W. 455, 25 L. R. A. 719; Kirkpatrick v. Bonsall, 72 Pa. 155.

And as illustrating lack of relevancy, our case of Givens v. Rogers, 11 Ala. 543, holding that price of property made contingent on the election of a certain public official was a wager. Other cases to the same effect, Merchants' Savings & Loan Trust Co. v. Goodrich, 75 Ill. 554; Hizer v. The State, 12 Ind. 330; Davis v. Leonard, 69 Ind. 213; Craig v. Andrews, 7 Iowa, 17, and other cases.

On the principle that it is customary for courts to take judicial notice of what is or ought to be generally known, we feel safe in holding that the courts take judicial knowledge that the price of cotton, as fixed by sales on the New York Cotton Exchange, is relevant to and influences the market price of spot cotton generally. Wall v. The State, 78 Ala. 417; Adler v. The State, 55 Ala. 16; Gordon Rankin Co. v. Tweedy, 74 Ala. 232, 49 Am. Rep. 813; 3 Mayf. Dig. 437; J. H. Arnold & Co. v. Gibson, 216 Ala. 314, 113 So. 25.

There is a recognized distinction between a sale and a mere executory contract of sale. As a general rule the contract is executory so long as something remains to be done, the performance of which is a condition precedent to a transfer of the title to the property. This principle is clearly stated in Shealy & Finn v. Edwards, 73 Ala. 175, 49 Am. Rep. 43, and is sustained by all the cases. See 23 R. C. L. 1346, § 170, and authorities cited in notes thereunder.

Taking the contract of October 16th as a basis of our observations, the contract remained executory up until delivery, the seller (plaintiff) having the right to fix the price, by calling for settlement, by notice to defend-

ants' brokerage office on the cotton exchange to sell, on their account, a corresponding number of bales, the call to be made on or before the last call day for December—November 24th. Assuming that the contract is to be construed in the light of the general custom prevailing in such matters—a question to be dealt with later—delivery was to be made during the first half of November. If plaintiff failed to make the call on or before the date specified, in the absence of further arrangement, defendants had the right to close the contract and make settlement, taking the market price of middling cotton on the New York Cotton Exchange as a basis, adding thereto the "points on New York," provided in the contracts, to take care of the difference between middling, good middling, and strict middling. This, we think, is the clear import of the original contract.

So long as this contract was executory, it was subject to modification by the parties without any consideration other than their mutual consent. E. T. Gray & Sons v. Satuloff Bros., 213 Ala. 526, 105 So. 666; Shealy & Finn v. Edwards, supra.

But if a consideration was necessary to sustain the subsequent agreement of the parties, the detriment suffered by the defendants in foregoing the right to close the transaction on the last call day would be sufficient to sustain the modified contract. Holt v. Robinson, 21 Ala. 106, 56 Am. Dec. 240; A. G. S. R. R. Co. v. South & North Ala. R. R. Co., 84 Ala. 570, 3 So. 286, 5 Am. St. Rep. 401; 6 R. C. L. 654, §§ 67, 68, 69.

The stipulation in the original contract, and in the contract as modified, as to the modo et forma of calling for settlement, did not make the plaintiff a party to the sales made and executed by Weil Bros. on the New York Cotton Exchange as a means of "hedging" or insuring against a fluctuating market. The clear intent of the parties here was that the buyer might have notice of the quantity of cotton for which settlement was to be made, and the buyer could, at their option, sell a like amount of cotton on the cotton exchange for future delivery, as a basis for fixing the price and as a means of insuring themselves against a fluctuating market; but in the "hedging" transaction the plaintiff was in no way interested. Such transactions have been upheld and their validity sustained against the attack that they were gambling transactions, in numerous cases, U. S. v. New York Coffee & Sugar Exchange, 263 U. S. 611, 44 S. Ct. 225, 68 L. Ed. 475; Browne v. Thorn, 260 U. S. 137, 43 S. Ct. 36, 67 L. Ed. 171; Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031; Kinsey Co. v. Board of Trade of the City of Chicago, 198 U. S. 236, 25 S. Ct. 637, 49 L. Ed. 1031; Board of Trade of City of Chicago v. L. A. Kinsey Co., 130 F. 507, 64 C. C. A. 669, 69 L. R. A. 59;

Cleage v. Laidley, 149 F. 346, 79 C. C. A. 284; Edgeley Co-operative Grain Co. v. S. H. Spitzer, 48 N. D. 406, 184 N. W. 880, 20 A. L. R. 1417, and extensive authorities pages 1422–1429.

The proposition that a contract for the sale of cotton at a price to be determined by the state of the market on some future date, and providing for advancement on delivery of what the parties contemplate might be only a part of the purchase price, is not a wager, is the consensus of judicial opinion. Smith v. Duncan (Tex. Com. App.) 209 S. W. 140; H. Seay & Co. v. Moore (Tex. Com. App.) 261 S. W. 1013; Moore v. H. Seay & Co. (Tex. Civ. App.) 228 S. W. 610: Furrh v. W. U. T. Co., 115 Tex. 125, 276 S. W. 645. See, also, Allen v. Sams, 31 Ga. App. 405, 120 S. E. 808.

On the other hand, where the contract fixes a definite price to be paid, in any event, for the transfer of the title, and delivery is then made, and the contract stipulates for an additional settlement based upon the fluctuation of the market thereafter, the stipulation for additional settlement is a wager, pure and simple. Burney v. Blanks (Tex. Civ. App.) 136 S. W. 806; Wolfe v. Andrews (Tex. Civ. App.) 192 S. W. 266, 268. We are of opinion that the contracts as originally made, and as modified, were not subject to the objection that they were wagering transactions.

The appellant's contention that Mazyck, its sales manager, was without authority to modify the contract, so as to extend the time within which calls for settlement could be made, is without merit.

While the authorities are not altogether in harmony, and the weight of authority seems to sustain the rule that mere authority to sell or solicit orders for the sale of commodities raises no inference of authority to rescind a completed sale, yet they are generally agreed that, so long as the contract of sale remains executory, an agent authorized to sell has implied authority to do everything necessary to complete the sale, and a general agent, such as Mazyck, is usually authorized to do all acts in connection with the business or employment with which he is engaged, and may, with the consent of the purchaser, rescind a completed sale and make another in its stead. Middle Division Elevator Company v. Melvin Vandeventer, 80 Ill. App. 669; Scott v. Wells, 6 Watts & S. (Pa.) 357, 40 Am. Dec. 568; Anderson v. Coonley, 21 Wend. (N. Y.) 279; Sturtevant v. Orser, 24 N. Y. 538, 82 Am. Dec. 321; Ricketson v. Richardson & Throckmorton, 19 Cal. 330; 31 Cyc. 1360–61 (D); 2 C. J. 608, § 242.

To state the proposition differently, a general agent is one who has all the powers of his principal, as to the business in which he is engaged, and may conduct it conversant with the lawful customs and usage of that

particular business. Syndicate Insurance Co. v. Catchings, 104 Ala. 187, 16 So. 46; Witcher v. Brewer, 49 Ala. 119; Wheeler v. McGuire, 86 Ala. 398, 5 So. 190, 2 L. R. A. 808; Kaufman Bros. & Co. v. Farley, 78 Iowa, 679, 43 N. W. 612, 16 Am. St. Rep. 462; Duncan v. Hartman Mfg. Co., 143 Pa. St. 595, 22 A. 1099, 24 Am. St. Rep. 570; 21 R. C. L. 853, §§ 32, 33 34; St. Louis Refrigerator & Wooden Gutter Co. v. Vinton Washing. Mach. Co., 79 Iowa, 239, 44 N. W. 370, 18 Am. St. Rep. 366; note 37 L. R. A. (N. S.) 93; 2 C. J. 608, § 243.

Adrian & Vollers v. Lane, 13 S. C. 183, involved the authority of a special agent to rescind a completed sale. Such was Bradford v. Bush, 10 Ala. 386. Johnson v. Wilson, 137 Ala. 468, 34 So. 392, 97 Am. St. Rep. 52, and Powell v. Henry & Co., 96 Ala. 412, 11 So. 311, related to the authority of special agents.

In Robinson v. Southern Cotton Oil Co., 108 S. C. 92, 93 S. E. 395, 396, the question related to the implied authority of the general manager of a cotton seed oil company engaged in ginning cotton to warrant or insure the safety of plaintiff's cotton left in care of the company after ginning. The holding there was that the making of a contract to exercise ordinary care and diligence to take care of the cotton of a customer was within the implied authority of such general agent, but the making of a contract, "to insure its safety, is not fairly inferable *from the bare fact* that Henderson was general manager of the business," the court observing "that implies authority only to do such things and make such contracts as may be necessary, and such as are *ordinarily incident to or usual,* in the conduct of the business delegated to him." (Italics supplied.)

This case in no sense militates against the principles heretofore stated, but in fact supports them.

The other cases cited by appellant, relevant to the question, are readily differentiated.

We have dealt with the question of the sufficiency of consideration for the agreement to modify, but we venture here the further observation that the provisional payments made by the defendants, and the mutual agreement of the parties to maintain the level of such provisional payments at within 2 cents of the prevailing market price, were also sufficient consideration to support the modification.

"The primary sense and the proper use of the term 'ultra vires,' in so far as it applies to corporate transactions, is to describe corporate transactions which are outside the objects for which the corporation was created, as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature." 14a C. J. 306, § 2157; California Nat'l Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198.

Appellant's contention here is that, under its charter powers and the act under which it was organized, it is prohibited from selling cotton for any one except its members, or to engage in gambling transactions; that the provisions for the fixation of the price required them to sell cotton for a nonmember, and such transactions were wagering transactions. These contentions have heretofore been determined contrary to appellant's contention.

We find no material conflict in the evidence. Each of the several contracts appear to have been modified, and the several lots of cotton were handled substantially in the same way. After the several transactions were closed, the defendants, on June 10, 1924, tendered to the plaintiff their check for $44,494.53, with a statement carrying the following: "Balance paid by check June 10th, 1924." This check and statement were received by plaintiff, the check indorsed and collected, and the money retained.

We think it may be assumed, in view of the contentions made in this case, that there was a dispute as to the basis on which a settlement should be made, and this afforded a sufficient basis for a valid accord and satisfaction, though less was paid than was really due. J. H. Arnold & Co. v. Gibson, 216 Ala. 314, 113 So. 25.

When the principles we have stated are applied, the charges requested by the appellant, and refused, were refused without error.

Nor was there error in giving the affirmative charge for the defendants, appellees.

Affirmed.

SAYRE, THOMAS, and BOULDIN, JJ., concur.