16 So.2d 406

**JOHNSON et al. v. SHOOK & FLETCHER SUPPLY CO. et al.**

**6 Div. 79.**

Supreme Court of Alabama.

Jan. 13, 1944.

R. G. Kelton, of Oneonta, and W. D. Denson, of Birmingham, for appellants.

Benners, Burr, Stokely & McKamy, of Birmingham, for appellees.

THOMAS, Justice.

The suit was on an alleged oral contract against several defendants for hauling iron ore.

The complaint was amended several times on the trial. The evidence was closed and argument had to the court on questions concluding plaintiff's right of recovery, and the court's decision announced for the defendant. The fourth amendment on which the trial was had charged a joint oral contract entered into by the plaintiffs and the defendants for hauling two and one-half million tons of ore from defendants' leased lands and washer. A motion, which was argued, was made by defendants to exclude the evidence. The defendants asked for the affirmative charge and the court indicated its judgment for them, whereupon plaintiffs offered to amend the complaint by adding count five, which the court declined to permit.

The statute providing for amendments while a cause is in progress is Title 7, Section 239, Code 1940, pertinent parts of which are: "The court must, whilst the cause is in progress, amend all and every such imperfection and defect of form, on motion of the party, without costs and without delay, unless injustice will thereby be done to the opposite party, * * *. But the court shall have the right to refuse the allowance of any amendment to the complaint after the conclusion of the argu-ment, when in its judgment the completion of the trial of the cause would be unreasonably delayed, or when in its judgment injustice would result."

The argument of the respective counsel having been completed on questions which disposed of the case for defendants under the court's ruling for defendants, and plaintiffs having delayed the suggestion of a further amendment, the court, acting within its supposed discretion, refused to allow the further amendment. The proposed fifth amendment was to strike all parties defendant except Shook & Fletcher Supply Company, a body corporate. The judgment entry recites as to this as follows: "On this the 13th day of February, 1942, came the parties by their attorneys, and defendant moved the court to exclude at conclusion of argument on this motion pro and con, the court announced its ruling and granted said motion, and plaintiff excepts; defendants then rested; plaintiffs thereupon requested the Court to be allowed to amend the complaint by filing Count Five (5), and the Court having announced its ruling and decision declined to allow the proposed amendment, to which action of the court plaintiff excepts; * * *."

The request for the affirmative charge by defendants was upon two grounds, to-wit: (1) That the alleged agent Vandergrift was without authority to make the kind of contract sued upon and bind the defendants; (2) that the suit was upon a joint contract, while the evidence showed there was no joint contract, but an alleged oral agreement with Vandergrift.

Plaintiffs' motion for a new trial contained pertinent observations of the court in explanation to plaintiffs' counsel of its ruling in declining the fifth amendment and in giving the affirmative instruction for defendant duly requested in writing. Several grounds of defendants' motion for a new trial contain these observations of the court to plaintiffs' counsel as to the ruling in question for defendants, towit: "I do not believe after the court has announced its ruling, you have got the right to undo the ruling of the court by wanting to amend it." And, among other observations, the court said: "To be frank and honest with you, there had been in my mind all along that they had not made out a case,"—meaning the plaintiffs.

■ Entertaining a motion by a defendant at the conclusion of evidence to exclude

all the evidence has been criticized; but under certain circumstances, the granting of such a motion has not been held error to reverse. Dorough v. Alabama Great Southern R. Co., 221 Ala. 305, 128 So. 602.

We proceed to a decision of the important question presented by the appeal. Had any injury resulted in the ruling of the court, we have indicated, it is immaterial. The affirmative charge was given for defendants on the ground that Vandergrift, the alleged agent for defendants, was without authority to make the contract declared on in count four of the complaint.

█ It has been held by this court that when the evidence is insufficient to support a count offered after the evidence is closed, the plaintiff is not prejudiced by the court's refusal to permit amendment. Westbrook v. Kansas City, M. & B. R. Co., 170 Ala. 574, 54 So. 231, 34 L.R.A.,N.S., 469; Nash v. Southern R. Co., 136 Ala. 177, 31 So. 932, 96 Am.St.Rep. 19; Fields v. Karter, 121 Ala. 329, 25 So. 800; Springfield Fire & Marine Ins. Co. v. De Jarnett, 111 Ala. 248, 19 So. 995; Beavers v. Hardie, 59 Ala. 570.

We have indicated that the trial was had on count four and pleas 4, 7, 8, 9, 12, 13, 14 and 15. The contents of the pleas, in addition to count four, will be set out in the statement of facts.

Addressing ourselves to the giving of the affirmative charge for defendants, it should be observed that, the plaintiffs claimed to have entered into an oral contract with defendants' agent by the terms of which defendants agreed to mine and deliver to the washers 2,500,000 tons of iron ore, and plaintiffs agreed to haul that amount of ore from the washer to the crusher operated by defendants. After plaintiffs had hauled only 24,000 tons of ore, for which they were paid, plaintiffs allege that defendants breached the contract by refusing to permit them to continue hauling ore.

Defendants were engaged in strip mining, had a lease on the right to mine and remove iron ore from certain sections of the land of the Tennessee Coal, Iron & R. Company and this fact was known to plaintiffs. The defendants' lease was dated December 1, 1939, to be terminated on the 30th day of November, 1944. Defendants had the right to renew the lease for an additional five year period, provided they had mined not less than three thousand tons during the twelve months ending August 31, 1944. Plaintiff Buckner's evidence shows he was experienced in the matter of which they contracted and that the ore was to be taken by defendants from the leased lands indicated. Defendants were obligated by the lease to mine only such ore as would be mined by a "prudent owner" who was himself conducting mining operations upon his own land.

The plaintiffs' evidence shows that the alleged contract was made with one E. N. Vandergrift, the "superintendent," for defendant. Buckner testified that Vandergrift was the "superintendent all over the mines in this vicinity around here and they have three or four different operations that he is the superintendent over. He hires and fires the employees at those mines. * * * Vandergrift is the only one that I talked with about the contract who represented the defendant." Johnson testified that Vandergrift was "general superintendent for Shook & Fletcher ore mines in the Birmingham District and he hires and fires employees for Shook & Fletcher Supply Company with reference to its mining operations in this area."

The testimony of both plaintiffs shows that the stripping operation was of an experimental character because of the quality of the ore, the difficulty of the stripping and of the several different experimental methods used in the matter of mining and the operation was unprofitable. The plaintiffs were small contractors and generally had two trucks running. Mr. Buckner kept an extra one there. Johnson testified that he could haul with two trucks more ore than they could put through the washer. This showed that plaintiffs were not equipped for extensive hauling of the ore within a year or the life of the lease of their alleged contract with defendants.

The question for decision is: "Was the alleged contract beyond the authority of Vandergrift to make?" No more far-reaching contract could be offered against a business corporation than that here alleged. The evidence shows that defendants were engaged only in the strip mining business, obtaining ore by stripping off the overburden from the land. Their operations under contract with the T. C. I. Company were defined and restricted. The ownership of the lands and the fact of the lease were known to plaintiffs or they were put upon notice of defendants' interest therein. If during the twelve months ending August 31, 1944, they had mined not

less than three thousand tons, the defendants had the right to renew the lease for five additional years. It is alleged that during the 14 month period plaintiffs hauled only 56,784 tons. At the time plaintiffs allege this contract was made with Vandergrift, defendants' lease had only three years and eleven months to run, upon limited conditions stated above. According to plaintiffs alleged contract, the defendant company was obligated to mine two million, five hundred thousand tons without regard to the conditions under which the mining was required to be done, and at the rate the work progressed it would have taken many years to mine the amount of ore stipulated in the contract.

As to the length of time required to fulfill the contract and the magnitude of the task imposed, Mr. Johnson, one of the plaintiffs, testified:

"* * * I did not tell my partner about how long a job this would be, but I told him it was a big job, and I figured that it would be a long job. * * * I did not figure how many years it would take. * * * I would not swear it would take fifty years to haul two million tons at the rate of forty thousand tons a year. I knew it would take an awful long time, though. It will take a long time to haul two million tons of ore with four trucks, and it would take a long time to haul it with a hundred trucks. * * *

"* * * When we asked Mr. Vandergrift how much ore we would have to haul, he said you see those hills over there, and pointed to the range of mountains. He said we have a lease on the land for three or four miles up and down the mountain, or two or three miles up and down the mountain. * * *"

The parties understood each other in their contract; the nature of the properties dealt with; the time of execution; the experimental nature of getting out the ore, washing it and transporting the two million five hundred thousand tons to be obtained by strip mining; that dealt with the overburden and the story told by the test pits; and the requirements of mining such ore as a prudent owner who was himself conducting the operation.

■ The officers and stockholders of the corporation would desire an operation at a reasonable profit and within a reasonable time, but the effect of such alleged contract required the operation to be accomplished without regard to profit or within a reasonable time. A general superintendent cannot ignore the corporate entity or usurp its power. To that end he must have a resolution of the corporation conferring upon him executive authority.

If Vandergrift could orally commit the defendants to plaintiffs, he could commit his employer to the exercise of the option to extend the time under the provisions for the renewal of the lease. No reasonable intendment could be so indulged or that the great quantity of ore could be mined or washed within the time stipulated, or that the company could be required to mine all of the ore on the land indicated regardless of the physical conditions or its quantity.

■ The question recurs, Had the defendants' operating agent or superintendent such authority? The question of agency has been considered by this court in many decisions. In 2 Amer.Juris, p. 76, § 95, the general rule is stated that: "A person dealing with a known agent is not authorized under any circumstances blindly to trust the agent's statements as to the extent of his powers; such person must not act negligently, but must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers. * * * The principal, on the other hand, may act on the presumption that third persons dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency. * * *"

■ To this text is cited our well-recognized decision of Wheeler v. McGuire, 86 Ala. 398, 5 So. 190, 191, 2 L.R.A. 808, wherein the rule is stated as follows: "* * * By his appointment the principal is regarded as saying to the public that he has the authority to transact the business in the usual and customary modes. Secret limitations on his power, or private instructions as to the mode of transacting the business, will not affect the rights of third persons who have no notice of such limitations or instructions. When a general agent transacts the business intrusted to him within the usual and ordinary scope of such business, he acts within the extent of his authority, and the principal is bound, provided the party dealing with the agents acts in good faith, and is not guilty of negligence which proximately contributes to the loss. [Louisville] Coffin Co. v. Stokes, 78 Ala. 372. Third persons, dealing with a person as a general agent, are not acquitted of all duty to inquire and as-

certain the character and extent of his agency; but if on inquiry it is ascertained to be general, actually or apparently, they are not bound to inquire whether there are secret limitations, or private instructions, unless they have knowledge of facts which should put them on such inquiry. As to these issues, the burden is on the plaintiffs * * *.'"

This case has been cited with approval in South Carolina Cotton Growers' Co-op. Ass'n v. Weil, 220 Ala. 568, 126 So. 637; Thigpen v. Arant, 213 Ala. 516, 105 So. 644; Cooper v. Cooper, 206 Ala. 519, 81 So. 82; Southern States Fire Ins. v. Kronenberg, 199 Ala. 164, 74 So. 63.

The plaintiffs testified that they could haul with two trucks more than defendants could put through the washer. This being true, to finish the contract in nine years, the defendants would be bound to construct or build more washers. Of this counsel observe, "Who had the authority to so contract? Its president or General Manager, not a mere foreman. Would not the directors of the corporation be entitled to consider a contract so far-reaching?"

In General Paint Corporation v. Kramer, 10 Cir., 57 F.2d 698, 702, the court said:

"The trial court denied defendants' motion for an instructed verdict, and this ruling is assigned as error. The defendants contend that the uncontradicted evidence discloses that Boylan had no authority to bind the corporations by a contract for life employment. The only direct evidence on the subject was Boylan's testimony that he did not have, and never had exercised, such authority. The plaintiff relies upon his broad powers of management; and further contends that, if prior authority was not proven, the defendants retained the benefits of the unauthorized agreement after notice of it, and cannot escape its burdens.

"First, of Boylan's authority. Mr. Mechem states the general rule as follows: 'A general manager, put in complete charge of a business in which servants, and the like, are ordinarily employed would have implied authority, within the range of what is reasonable and proper, to employ the necessary help. In doing so, he may make contracts of a usual and reasonable sort, such as for example, the hiring of an employee for a year; or the assumption of the risk of the employee's competency to fill the position.' Mechem on Agency, § 988.

"A contract for life employment is not within this rule; and authority to enter into such unusual and far-reaching contracts cannot lightly be implied. This rule is particularly applicable where the principal is a corporation. Corporation statutes contemplate the right of the stockholders periodically to change the management of the affairs of their corporation, by providing for annual or biennial election of directors. * * *'"

In Plant v. White River Lumber Co., 8 Cir., 76 F.2d 155, 157, it was observed:

"The case turns largely upon the authority of Keaton to bind appellee by the contract in suit. Concededly he had no express authority to do so, and the question presented is whether such authority is implied from the nature of his employment. Appellant invokes the conceded rule that 'the law implies that the agent is authorized to do and perform all acts reasonably necessary and proper to carry into effect the main authority conferred.' * * *

"Giving to all the testimony and evidence offered its full probative effect, it is at least doubtful if either Keaton or Plant regarded this contract as effective beyond the ordinary seasonal period, if at all. However, courts generally have dealt satisfactorily with similar situations. There is a difference between general authority to bind a principal in the course of a known business, and one to dispose of the entire corpus of a corporation. Anderson-Tully Co. v. Gillett Lumber Co., 155 Ark. 224–234, 244 S.W. 26. The general manager of a corporation has no implied authority to bind it by a sale of its physical properties. Nor can such a sale, if made, be ratified by officers of the corporation, who, themselves, have no such power. Morning Star Mining Co. v. Bennett, 164 Ark. 244, 251, 261 S.W. 639.

"The 'authority to enter into such unusual and far-reaching contracts cannot lightly be implied. * * * The general and salutary rule undoubtedly, is that authority to enter into contracts of employment for a term of years or for life is not to be implied from the power of management; and it is a matter of grave doubt whether a board of directors, elected for one year, can expressly authorize contracts that deprive succeeding boards of their statutory powers of management.' * * * Compare [In re] Floyd Acceptances, 7 Wall. 666, 19 L.Ed. 169.

" 'No presumption of law can be indulged in that, because a person acts as such a manager, he has the power to bind his principal to contracts of an extraordinary nature, and of such a character as would involve the corporation in enormous obligations and for long periods of time.' Camacho v. Hamilton Bank Note & Engraving Co., 2 App.Div. 369, 37 N.Y. S. 725, quoted with approval in Laird v. Michigan Lubricator Co., 153 Mich. 52, 116 N.W. 534, 535, 17 L.R.A.,N.S., 177.

" 'A general agent has no implied authority to bind his principal by contracts unusual to agencies of like character, or beyond the usual scope of such agencies; and when he attempts to bind his principal by his extraordinary acts, the one dealing with him is put upon notice, and required to ascertain from some authoritative source whether such agent had the power to bind his principal thereby.

" 'One who has been employed as a field superintendent of logging operations, with authority to have timber cut from time to time as needed for a corporation, his principal, and subject to be discharged at any time, has no implied authority to bind his principal with an indefinite contract for cutting the timber from a large tract of land which might last for years, and involving the expenditure of many thousands of dollars, and in an action to recover damages for a breach of the contract it is necessary for the plaintiff to show that the agent had express authority or that the principal ratified his act.' Chesson v. Richmond Cedar Works, 172 N.C. 32, 89 S.E. 800, L.R.A.1918F, 6."

The case of Stephens v. John L. Roper Lumber Co., 160 N.C. 107, 75 S.E. 933, 934, 41 L.R.A.,N.S., 1141, considered a contract alleged to have been made by the superintendent of a lumber camp under his implied authority, to pay a salary to a third party in consideration of his refraining from taking other employment and holding himself in readiness to resume work on notice. Mr. Justice Hoke for the North Carolina court said:

"By virtue of his position, then, this superintendent had general power to do what was usual and necessary to carry on the business intrusted to him, and in furtherance of his employer's interest to make all such contracts as were reasonable and appropriate to that end; but this authority is not without limitations. Such an officer is by no means a universal agent, but is restricted, as stated, to 'those acts and contracts usually exercised by other agents in the same line of business under similar circumstances, and must conduct the particular business of the principal in the manner usually employed by other agents of the same kind.' 1 Clark & S. Agency, § 203, p. 475.

"Again, it is well recognized that a third person dealing with one known to be an agent is not relieved of all obligations in the matter, but is held to the exercise of reasonable prudence; and if an agent, though a general one, departing from legitimate effort in his employer's interests tenders a contract so unusual and remarkable as to arouse the inquiry of a man of average business prudence, the third party is not allowed to act upon assumptions which ordinarily obtain. He is put upon notice, and must ascertain if actual authority has been conferred. 1 Clark & S. Agency, p. 509; Mechem on Agency, §§ 289, 290; 31 Cyc. pp. 1340–1346. * * *

"And in Mechem, supra: 'Third persons must act in good faith. It is evident that these rules are established for the protection of third persons who act in good faith. As has been stated, every person dealing with an agent is bound to ascertain the nature and extent of his authority. He must not trust to the mere presumption of authority, nor to any mere assumption of authority by the agent. He must at all times be able to trace the authority home to its source. Keeping within the scope of that authority, he is safe, and cannot be affected by secret instructions of which he was ignorant. But if he had knowledge of the instructions, or notice sufficient to put him upon an inquiry by which they might have been discovered, he will be held bound by them.' And further (section 290): 'The person dealing with the agent must also act with ordinary prudence and reasonable diligence. If the character assumed by the agent is of such a suspicious or unreasonable nature, or if *the authority which he seeks to exercise is of such an unusual or improbable character, as would suffice to put on ordinarily prudent man upon his guard, the party dealing with him may not shut his eyes to the real state of the case,* but should either refuse to deal with the agent at all, or should ascertain from the principal the true condition of affairs.' " [Italics supplied.]

Where there is no dispute in the evidence, the question of whether the con-

tract is reasonable is one for the court and not for the jury. Alabama Mills v. Smith, 237 Ala. 296, 300, 186 So. 699; Carney v. New York Life Ins. Co., 162 N.Y. 553, 57 N.E. 78, 49 L.R.A. 471, 76 Am.St.Rep. 347; Plant v. White Lumber Co., supra.

We conclude by saying that the defendant pleaded the statute of frauds to the effect that a contract which by its terms is not to be performed within a year must be in writing. The matter presented by this pleading and evidence was dealt with in W. P. Brown & Sons Lumber Co. v. Rattray, 238 Ala. 406, 192 So. 851, 129 A.L.R. 526, and the statute of frauds and improbability of performance of a contract within a year were considered from the standpoint of the general authorities.

It is elementary that contracts will be construed in the light of the circumstances surrounding the parties when the contracts are made. The plaintiffs were casual truckers of small means. They had three or four trucks. No ore was to be hauled by them except such as had been washed and small quantities which might not require washing. The leased lands were presumed to contain two and one-half million tons of ore. Taking into consideration the quantity of the ore, defendants' facilities for washing it, to say nothing of plaintiffs' facilities for hauling it, it was impossible for all of the marketable ore or *all that a prudent operator would mine to be taken from the land, washed and hauled* directly to the crusher, or taken directly to the crusher where washing was unnecessary, *within a year*. According to the experience shown by the evidence of the actual mining, it would take fifty years to mine all the ore sought to be subjected to the alleged oral contract.

There is nothing in the evidence from which it can be deduced: (1) that it was possible to mine all the ore in a year; or (2) that it was contemplated by the parties that such thing should be done. The evidence points to the contrary. The case in this aspect has two features. First, whether in view of all of the circumstances and all that was said and done, it was a term of the contract that the ore should be mined and removed within a year. Second, whether in view of the circumstances, it was possible for all of the ore to be removed within a year. Hence the affirmative charge, duly requested by the defendants, was given without error.

There being no dispute in the evidence, the question of whether the alleged contract was a reasonable one or within the statute of fraud, was for the court, and we hold that the defendants were entitled to the affirmative charge, duly requested in writing, and which was given. The judgment of the circuit court is affirmed.

Affirmed.

GARDNER, C. J., and BROWN and LIVINGSTON, JJ., concur only in conclusion announced.