Robert C. HULL, Jr., W.S. Voit, and W.F. Bonner, Jr., Trustees of the Edward F. Reed Trust, and Edward E. Tuttle, Merlin W. Call and Sam T. Allen, III, Trustees of the Mary Elizabeth Reed and the Margaret R. Kosek Trust, Plaintiffs/Appellees/Cross–Appellants,

v.

SUN REFINING AND MARKETING COMPANY,
Defendant/Appellant/Cross–Appellee.

No. 71179.

Supreme Court of Oklahoma.

Sept. 26, 1989.

As Corrected May 3, 1990.

Rehearing Denied May 4, 1990.

Philip D. Hart, Steven W. Bugg, Oklahoma City, for defendant/appellant/cross-appellee.

Robin Stead, Norman, Fred A. Gipson, Seminole, for plaintiffs/appellees/cross-appellants.

Clyde A. Muchmore, Mark D. Christiansen, Oklahoma City, for amicus curiae Koch Oil Co., Total Petroleum, Inc., The Permian Corp. and Citgo Petroleum Corp.

KAUGER, Justice.

The issues presented are: 1) whether a lessor's demonstration of marketable title is sufficient to maintain an action under 52 O.S.Supp.1985 § 540,[1] providing for the payment of proceeds from oil and gas production; 2) whether lessors are bound by a contract provision implied from custom and usage requiring execution of a division order in a contract negotiated by a lessee as agent for the sale of oil; and 3) whether either party may be characterized as a prevailing party entitled to court costs and reasonable attorney's fees. We find that: 1) because the only condition for which 52 O.S.Supp.1985 § 540 justifies suspension of royalty payments is the existence of unmarketable title, failure to execute a division order is not a defense to an action for the payment of proceeds from oil production; 2) the agent-lessee could not bind the principal-lessor to a trade usage no longer recognized and contrary to public policy; and 3) the lessors are prevailing parties entitled to reasonable attorney's fees under 12 O.S.Supp.1985 § 540(C). The determination that royalty owners need not execute division orders before commencing an action pursuant to § 540 negates the necessity of addressing the issues of whether the trial court erred in composing a list of factors properly included in division orders or improperly considered extrinsic evidence in drafting the list, and whether the division of interest form presented by the lessors was sufficient to show they were parties entitled to payment pursuant to § 540.

FACTS

The lessors have marketable title to all the oil, gas, and other minerals underlying

---

1. Title 52 O.S.Supp.1985 § 540 provides:

"A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production. Provided, such purchasers may remit to the persons entitled to such proceeds from production semiannually for the aggregate of six (6) months' accumulation of monthly proceeds of amounts less than Fifteen Dollars ($15.00). Further provided, that any delay in determining the persons legally entitled to an interest in such proceeds from production caused by unmarketable title to such interest shall not affect payments to persons whose title is marketable. Provided, however, that in those instances where such proceeds cannot be paid because the title thereto is not marketable, the purchasers of such production shall cause all proceeds due such interest to earn interest at the rate of six percent (6%) per annum, until such time as the title to such interest has been perfected. Marketability of title shall be determined in accordance with the then current title examination standards of the Oklahoma Bar Association. The first purchaser shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto.

B. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, calculated from date of first sale.

C. The district court for the county in which the oil or gas well is located shall have jurisdiction over all proceedings brought pursuant to this act. The prevailing party in any proceeding brought pursuant to this act shall be entitled to recover any court costs and reasonable attorney's fees."

This section was amended effective May 12, 1989. See note 7, infra.

the Reed # 1–31 well (Reed). These minerals were leased to C.M. Jones d/b/a Five Star Oil & Gas Company on October 15, 1983. Under the lease, the lessors are entitled, free of costs, to one-fourth (¼) of all oil produced and saved from the leased premises. The lease was assigned to Bill O. Andress (Andress/lessee/operator), the lessee and operator at the time the Reed was drilled and completed. Production from the Reed began in December of 1985. Although the lessors were entitled to take their ¼ interest in kind, they did not do so. Therefore, Andress, acting on his own behalf and as agent for the lessors, negotiated an oil purchase contract with Sun. Sun asserts that a material term of the oil purchase contract included the requirement that the lessors sign their standard division order. The lessors argue that Sun and Andress did not discuss the necessity of signing a division order as a part of the oil purchase contract, and that Andress did not understand such orders were routinely required as a condition precedent to royalty payments. However, both in his deposition and at trial, Andress testified that he understood that all parties entitled to royalty payments would be required to sign division orders as part of the customary practice in negotiating an oil purchase contract.

Sun is the first purchaser responsible for royalty payments to the lessors pursuant to § 540. Sun received a division order title opinion on February 14, 1986. On the basis of the opinion, Sun submitted its standard division order to Hull for signature on March 6, 1986. Besides setting forth the proportionate share of royalty each lessor is entitled to receive and their respective tax identification numbers, the division order contains nine other covenants which

cover: 1) the quality of the oil and how it will be measured; 2) comingling; 3) warranty of title; 4) oil sales; 5) passage of title; 6) change of interest; 7) tax deductions; 8) production standards; and 9) effective date of the division order.

Hull refused to sign Sun's standard division order submitting instead a division of interest form on March 19, 1986. In addition to providing the respective percentage interests of each lessor and their tax identification numbers, the division of interest form provided that: 1) the lessors were the owners of royalties payable under the Reed, giving a legal description of the property; 2) the lessors certified the royalties were payable in cash according to the lease agreement and subject to applicable federal and state laws until a notification of change of interest was received by the purchaser; 3) royalties of less than $25.00 per month could be allowed to accrue to $25.00 or December of the respective year; and 4) that the division of interest form would supersede any previously executed division order covering the described property.

Sun refused to accept Hull's division of interest form on the basis that it: 1) did not contain the specific terms of purchase; 2) did not warrant title; 3) did not provide a mechanism for resolving title disputes; and 4) attempted to make Sun subject to the terms of the lease. Sun prepared and submitted a revised division order on February 9, 1987. The revised division order provided that the division order did not amend the lease provisions between the interest owners and the lessee and divided those provisions applicable to royalty interest owners from those that were specifically applicable to working interest owners.[2]

**2.** This revised order contained seven provisions applicable to the lessors providing that: 1) Sun is the designated agent to receive the oil allocable under the division order and that the owners agree to indemnify and hold Sun harmless from liability for payments made to the owner in accordance with the order; 2) payment would be monthly and that payments of $25.00 or less would be allowed to accrue to $25.00 or December 31; 3) the owner was to notify Sun in

writing of any change or transfer of interest which would bind Sun only upon receipt of the original instrument of transfer or a certified copy thereof, that the change would become effective on the first day of the month commencing 15 days after receipt of the notice, that Sun would be provided written notice in the form of a certified pleading of any suit filed affecting the interest of an owner, that if Sun was made a party to the suit, the owner would

On October 6, 1986, the lessors filed a petition alleging that Sun was a first purchaser responsible for royalty payments under the Reed. The lessors prayer for relief included payment of all royalties due and owing, 12% interest, court costs, and reasonable attorney's fees. The petition was amended on January 8, 1987, to reflect the lessor's ownership and right to royalty payments. On January 23, 1987, Sun filed its answer to the amended petition admitting that it was the first purchaser of products from the Reed but denying that the lessors were legally entitled to royalty payments. As an affirmative defense, Sun alleged that it had entered an oil purchase contract with Andress and pursuant to the contract terms, the lessors were required to execute a standard division order as a condition precedent to receiving royalty payments. Because no division order had been signed, Sun alleged that the lessors were not entitled to payment under the contract. Sun prayed that judgment be entered in its favor and that it be allowed to recover costs and attorney's fees. The cause was tried to the court on March 17 and 18, 1988. Both parties submitted proposed findings of fact and conclusions of law. On May 18, 1988, the trial court rendered judgment finding that the division of interest form submitted by Hull was insufficient to meet the requirements of the oil purchaser but that the two division orders submitted by Sun were overinclusive, containing matters not essential to a determination that the lessors were legally entitled to royalty payments. The trial court found that the lessors were legally entitled to proceeds and accrued interest

payable upon execution of a division order containing factors similar to those set forth by the court. Neither party was found to be a prevailing party within the meaning of § 540. Each party was ordered to bear his/her own costs and attorneys fees.

## I

THE ONLY CONDITION PRECEDENT TO RECOVERY UNDER 52 O.S.Supp. 1985 § 540 IS A SHOWING OF MARKETABLE TITLE. THE CUSTOM AND USAGE RECOGNIZED AT COMMON LAW REQUIRING EXECUTION OF A DIVISION ORDER AS A CONDITION PRECEDENT TO PAYMENT OF ROYALTY PROCEEDS DID NOT SURVIVE THE ENACTMENT OF 52 O.S.Supp.1985 § 540.

### A

■ The payment of royalties from an oil or gas unit is expressly governed by 52 O.S.Supp.1985 § 540.[3] Hull asserts that the only condition justifying suspension of royalty payments under § 540 arises when title is questioned. Sun argues that the language in subsection 540(A) referring to persons legally entitled to payment indicates that there may be conditions other than unmarketable title justifying delayed payment. Sun believes one of these "conditions" precedent to payment is a requirement that the lessor execute a division order.

Subsection 540(A) specifically provides that royalty payments "shall be paid to

---

indemnify Sun against any judgment and reimburse Sun's costs, attorney's fees, and other expenses incurred in conjunction with the suit; 4) that in the event of a claim or dispute affecting title or failure to provide notice of change in ownership, Sun would be authorized to withhold payments until the claim was settled or the information provided; 5) the owner warrants that the lessee has full authority to sell on terms the lessee determines, all oil produced from the described property; 6) Sun is authorized to withhold and pay any applicable tax levied against the owner on account of royalty payments; and 7) that cancellation of the division

order will be effective on the first day of the month commencing 30 days after receipt of written notice of cancellation. Both the provision relating to accumulation of proceeds and to payment of interest on royalties suspended due to title questions are made subject to any applicable statute.

3. *Seal v. Corporation Comm'n,* 725 P.2d 278, 294–95 (Okla.1986), *appeal dismissed,* 479 U.S. 1073, 107 S.Ct. 1265, 94 L.Ed.2d 126 (1987).

persons legally entitled thereto" beginning no later than 6 months after the first sale. Where delays in determining "persons legally entitled" to payment are based upon unmarketable title, royalty proceeds may be suspended but must earn 6% interest until title is cleared. However, even when some of the interest holders' payments may be suspended due to questionable title, subsection 540(A) provides that this delay "shall not affect payments to persons whose title is marketable."

Marketable title is determined under § 540 pursuant to the Oklahoma Bar Association's title examination standards. Marketable title is defined in § 4.1 of the standards as "synonymous with a perfect title or clear title of record; and is one free from apparent defects, grave doubts and litigious uncertainty, and consists of both legal and equitable title fairly deducible of record." [4] The Legislature was undoubtedly aware at the time that § 540 was enacted that the largest volume of an ever increasing case load of litigation between royalty owners and purchasers is precipated by the use of suspense accounts.[5] By using marketable title as a standard for payment under § 540, the Legislature ex-

pressed its intent that suspense of royalty payments was proper only when a legitimate question as to marketability of title existed and gave purchasers a guideline to avoid needless litigation arising from suspended payments.

The Legislature's use of the term "shall" in § 540(A) in relation both to the time when payments must commence and to payments to interest owners with marketable title indicates a legislative mandate equivalent to the term "must," requiring interpretation as a command.[6] We find that the language of subsection 540(A) requires payment of royalty proceeds within 6 months of the date of the first sale if title is marketable. Because the only condition for which § 540 justifies suspension of royalty payments is the existence of unmarketable title, requiring execution of a division order as a condition precedent to recovery would create a condition for payment neither expressly nor impliedly imposed by the Legislature in a statute written in clear and unambiguous terms.[7]

Sun cites *Blausey v. Stein,* 61 Ohio St.2d 264, 15 Ohio Op.3d 268, 400 N.E.2d 408, 410–11 (1980), and a trilogy of Tenth Circuit cases[8] in support of its position that

---

4. Title 16 O.S.1981, Ch. 1, App., § 4.1. This provision was adopted and revised by the Oklahoma Bar Association's House of Delegates in 1987; however, the language of § 4.1 was not altered from its 1981 version.

5. P. Lear, "First Purchaser Suspense Accounts," 33 Rockey Mtn.Min.L.Inst. 17–1, 17–3–4, Ch. 17, § 17.01 (1987).

6. *Schaeffer v. Schaeffer,* 743 P.2d 1038, 1040 (Okla.1987); *TIB Corp. v. Edmondson,* 630 P.2d 1296–97 (Okla.1981); *Sneed v. Sneed,* 585 P.2d 1363–64 (Okla.1978).

7. *We note that* 52 O.S.Supp.1985 § 540 *was amended effective July 1, 1989. We express no opinion as to how the amendment may affect future causes presenting the issue of execution of division orders.* S.B. 107 (May 12, 1989), amending 52 O.S.Supp.1985 § 540 and repealing 52 O.S.Supp.1984 §§ 567 and 568, provides in pertinent part:
 "... B. A division order is an instrument for the purpose of directing the distribution of proceeds from the sale of oil, gas, casinghead gas or other related hydrocarbons which war-

rants in writing the division of interest and the name, address and tax identification number of such interest owner with a provision requiring notice of change of ownership. A division order is executed to enable the purchaser of the production from the leasehold to make remittance directly to the interest owners for their royalty interest, and is not intended to and does not relieve the lessee of any liabilities or obligations under the oil and gas lease. A division order which varies the terms of any oil and gas lease is invalid to the extent of the variance unless those changes have been previously agreed to by the affected parties. This subsection shall only apply to division orders executed on or after July 1, 1989 ..."

8. *Wolfe v. Shell Petroleum Corp.,* 83 F.2d 438, 443 (10th Cir.1936), *cert denied,* 299 U.S. 553, 57 S.Ct. 19, 81 L.Ed. 407 (1936); *Wolfe v. Prairie Oil & Gas Co.,* 83 F.2d 434, 438 (10th Cir.1936); *Wolfe v. Texas Co.,* 83 F.2d 425, 429 (10th Cir. 1936), *cert. denied,* 299 U.S. 553, 57 S.Ct. 15, 81 L.Ed. 407 (1936).

division orders are conditions precedent to payment under § 540. Both *Blausey* and the *Wolfe* trilogy are distinguishable in one material respect—in deciding those cases, neither the Ohio Supreme Court nor the Tenth Circuit had before them a statute similar to § 540.[9] In addition, in the *Wolfe* cases, a legitimate question as to the merchantability of title existed. Here, all parties agree that the lessors are the owners of and have marketable title to all the oil, gas and other minerals underlying the Reed.

Sun also relies on *Teel v. Public Serv. Co.*, 767 P.2d 391, 397 (Okla.1985), for the proposition that royalty owners must sign division orders if purchasers are to have protection from suits for conversion. Although the Court recognized the importance of division orders in *Teel*, it did not find that the absence of an executed division order was sufficient to justify a finding of conversion. The purchaser must also have notice that the operator's right to market the product has been revoked. In addition, *Teel* is in the same posture as both *Blausey* and the *Wolfe* cases. Section 540, prospective in nature, did not apply to

*Teel* because the statute was enacted after the suit was filed and the trial court had ordered escrow of the royalty funds.

**B**

█ A general custom or usage is part of the common law.[10] A usage is a practice or method observed with regularity with respect to the transaction being performed.[11] Under the common law, a recognized custom and usage of the oil and gas industry included the requirement that royalty holders execute division orders before receiving royalty payments.[12] Sun asserts that an interpretation of § 540 finding that execution of a division order is not a condition prerequisite to a suit for royalty payments creates an impermissible conflict with the common law. Because nothing in § 540 specifically abrogates the necessity of signing a division order, Sun argues that § 540 must be interpreted in a fashion to preserve the purchaser's right to demand execution of a division order.

█ Except as altered by our constitution and statutes, the common law remains

9. Even those authors emphasizing the importance of division orders to the oil and gas industry recognize that statutes similar to 52 O.S. Supp.1985 § 540 may require payment in absence of an executed division order. See, P. Lear, "First Purchaser Suspense Accounts," see note 5 at 17–16, § 17.04(1)(a), supra; W. Legg & A. Murrah, Jr., "Royalty Payments—Who Owes How Much to Whom and When?" 35 Inst. on Oil & Gas L. & Tax'n 159, 165 (1984); S. Hollimon, "Division Orders—A Primer," 34 Ins. on Oil & Gas L. & Tax'n 332 (1983); M. Twenhafel, "Oil–Gas Division Orders: Their Origin, Varieties, & Usage," 27 Rockey Mtn.Min.L.Inst. 1479, 1508–09 (1982); W. Boyd, Jr., "Crude Oil Purchasing—Its Title Opinions & Division Orders," 18 Inst. on Oil & Gas L. & Tax'n 233, 262 (1967). Additionally, other courts have held that execution of a division order is not a condition precedent to receipt of royalty payments. See, *Fontenot v. Sunray Mid–Continent Oil Co.*, 197 So.2d 715, 719 (La.Ct.App.1967). See also, *Sellers v. Continental Oil Co.*, 168 So.2d 435, 437–38 (La. Ct.App.1964) (In which a lease was partially cancelled for failure to make royalty payments where no division order was signed by the lessor.).

10. *Cruce v. Pierce Oil Corp.*, 279 F. 728, 731 (8th Cir.1922).

11. Title 25 O.S.1981 § 19 provides:

"Usage is a reasonable and lawful public custom concerning transactions of the same nature as those which are to be affected thereby, existing at the place where the obligation is to be performed, and either known to the parties, or so well established, general and uniform, that they must be presumed to have acted with reference thereto."

Title 12A O.S.1981 § 1–205(2) provides:

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court."

12. *Wolfe v. Shell Petroleum Corp.*, see note 8 at 442–43, supra; *Wolfe v. Texas Co.*, see note 8, supra; *Indian Territory Illuminating Oil Co. v. Killingsworth*, 175 Okl. 78, 51 P.2d 505, 506–07 (1935).

in full force and effect.[13] Statutes may abolish a common law right where the intention to do so is plainly expressed.[14] Although § 540 does not expressly state that the recognized common law custom and usage requiring execution of a division order has been abrogated, it does provide that even when suspension is justified as to some parties due to lack of marketable title, that situation "shall not affect payments to persons whose title is marketable." The text of § 540 is not inconclusive. The only condition justifying suspension of royalty payments is a lack of marketable title. Custom or usage repugnant to expressed provisions of a statute is void.[15] When conflict exists between a statute and custom and usage, the statute controls.[16] Section 540 was enacted for a purpose—to ensure that those entitled to royalty payments would receive proceeds in a timely fashion. Where a statute is enacted for the purpose of preventing an act—here, needless suspension of royalty proceeds, no custom can prevail over its provisions.[17] In enacting § 540, the Legislature has expressed its intent that it shall be the public policy in Oklahoma for royalty owners to receive prompt payment from the sale of oil and gas products. The right to payment rests upon a showing of marketable title.

Division orders are contracts between the sellers of production and the purchaser executed primarily to protect the purchaser.[18] Although division orders do not alter lease provisions,[19] they are revocable authorizations to pay binding upon royalty owners until revoked.[20] Therefore, when a royalty owner executes a division order, the owner is bound by provisions of the division order which may abrogate or alter rights under the lease. An interpretation that the common law custom and usage relating to division orders survived the enactment of § 540 would not only contravene the statute's express provision requiring payment to parties with marketable title, it would also permit purchasers to defeat the Legislature's intent by withholding payment until lessors execute an unaltered document containing provisions which may both contravene the lease and be unfavorable to the lessor. Although § 540 did not preclude negotiations between royalty owners and purchasers for the signing of a division order, purchasers may not under the guise of custom and usage impose unfavorable conditions on royalty owners using a threat of suspended payment to coerce acquiescence.

**13.** Title 12 O.S.1981 § 2 provides:
"The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma; but the rule of the common law, that statutes in derogation thereof, shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object."

**14.** *Reaves v. Reaves,* 15 Okl. 240, 82 P. 490, 495 (1905).

**15.** *Tenneco Oil Co. v. El Paso Natural Gas Co.,* 687 P.2d 1049, 1054 (Okla.1984); *McCasland v. Board of Comm'rs,* 126 Okl. 103, 258 P. 750, 752 (1927).

**16.** *Smith v. Cox,* 301 P.2d 649, 651 (Okla.1956). See also, *Franklin v. Shelton,* 250 F.2d 92, 96 (10th Cir.1957), *cert. denied,* 355 U.S. 959, 78 S.Ct. 544, 2 L.Ed.2d 533 (1958).

**17.** See, *Oklahoma, N.M. & P. Ry. Co. v. Downey,* 116 Okl. 253, 244 P. 173–74 (1925).

**18.** *Maddox v. Gulf Oil Corp.,* 222 Kan. 733, 567 P.2d 1326, 1328 (1977), *cert denied,* 434 U.S. 1065, 98 S.Ct. 1242, 55 L.Ed.2d 767 (1978); *Wagner v. Sunray Mid–Continent Oil Co.,* 182 Kan. 81, 318 P.2d 1039, 1047 (1957).

**19.** *Gavenda v. Strata Energy,* 705 S.W.2d 690–91 (Tex.1986); *Holmes v. Kewanee Oil Co.,* 233 Kan. 544, 664 P.2d 1335, 1341 (1983), *cert denied,* 474 U.S. 953, 106 S.Ct. 322, 88 L.Ed.2d 305 (1985); A. Bounds, "Division Orders," 5 Inst. on Oil & Gas L. & Tax'n 103 (1954).

**20.** *Phillips Petroleum Co. v. Williams,* 158 F.2d 723, 727 (5th Cir.1946); *Cabot Corp. v. Brown,* 754 S.W.2d 104, 107 (Tex.1987); 4 Williams & Meyers, "Oil & Gas Law," 571, 604, Ch. 7, § 705 (1988); R. Hemingway, "The Law of Oil & Gas," 336, 367, Ch. 7, § 7.5 (2d Ed.1983).

## II

### THE AGENT–LESSEE COULD NOT BIND THE PRINCIPAL–LESSOR TO A TRADE USAGE NO LONGER RECOGNIZED AND CONTRARY TO PUBLIC POLICY.

Both Sun and the lessors agree that Andress acted as agent for the lessors in negotiating the contract for the sale of oil. Sun asserts that the lessors are bound by all terms of the contract, both those actually negotiated and those implied. Principal among the terms which Sun proposes to impose upon Hull is the execution of Sun's standard division order. Neither Sun nor Andress argue that the requirement to sign a division order was expressly discussed. However, Sun asserts that the custom and usage in the industry requiring execution of a division order before receiving payment for royalties was included in the oil purchase contract. Sun argues that the lessors are bound by the contract negotiated by their agent and must sign a division order to be entitled to payment.

 The custom and usage that Sun relies upon—execution of a division order as a condition precedent to payment for royalty proceeds—did not survive the enactment of § 540. Although agents may contract and bind their principals to trade customs and usages,[21] that power does not extend to customs and usages which are either illegal or contrary to public policy.[22] The requirement that lessors execute division orders before receiving royalty payments conflicts with the spirit and letter of § 540 and is violative of the public policy intended to be promoted through its enactment—prompt payment to royalty owners of proceeds from the sale of oil or gas.

---

**21.** See, Restatement (Second) of Agency § 34 (1957) providing in pertinent part:
"An authorization is interpreted in light of all accompanying circumstances, including among other matters ...
(b) the general usages of business, the usages of trades or employments of the kind to which the authorization relates, and the business methods of the principal ..."

## III

### AS PREVAILING PARTIES, THE LESSORS ARE ENTITLED TO COURT COSTS AND REASONABLE ATTORNEY'S FEES.

 The lessors have demonstrated the only condition precedent to a recovery under § 540—marketable title. Because Sun has failed to promptly pay the royalties due under § 540(A), they are subject to the 12% penalty provided by § 540(B) calculated from the date of first sale. Because the lessors are prevailing parties, § 540(C) entitles them to court costs and reasonable attorney's fees. The cause is remanded to determine an amount representing reasonable fees for prosecution of this cause in accordance with *State ex rel. Burk v. Oklahoma City*, 598 P.2d 659, 661 (Okla. 1979) and *Oliver's Sports Center v. Nat'l Standard Ins.*, 615 P.2d 291, 294–95 (Okla. 1980).

REVERSED AND REMANDED

HARGRAVE, C.J., and LAVENDER, DOOLIN and ALMA WILSON, JJ., concur.

OPALA, V.C.J., and HODGES, SIMMS and SUMMERS, JJ., dissent.

SIMMS, Justice, dissenting:

Today the majority holds that with the enactment of 52 O.S.Supp.1985, § 540, the requirement of execution of a division order as a prerequisite to payment for royalty proceeds became "violative of public policy." In my opinion, the majority's holding is contrary to the law and unsupported by the facts of this case, and I must respectfully dissent.

See also, *Johnson v. Shook & Fletcher*, 245 Ala. 123, 16 So.2d 406, 413 (1944); *South Carolina Cotton Growers' Co-op Ass'n v. Weil*, 220 Ala. 568, 126 So. 637, 642 (1929); *Hilsinger v. Trickett*, 86 Ohio St. 286, 99 N.E. 305, 307 (1912).

**22.** *Hall v. Paine*, 224 Mass. 62, 112 N.E. 153, 158 (1916).

To reach this broad-brush "public policy" result, the majority has apparently interpreted § 540 in total isolation, for in its own opinion the majority has acknowledged that:

1) A division order is a device of long standing in the oil purchasing industry and a recognized part of the custom and usage of the industry; and

2) Through custom and usage, division orders have always been required to entitle a royalty owner to receive payment for proceeds from purchaser; and

3) The requirement of execution of a division order before a royalty owner is entitled to receive payment is part of the common law which remains in full force and effect unless a statute plainly expresses the intent to abolish that common law right; and

4) Section 540 does not plainly, or otherwise, express any intent to abolish the common law custom and usage requirement of execution of division orders; and

5) The new 1989 amendment to § 540, 52 O.S.Supp.1989, § 540(B), explicitly provides for the execution of division orders as a prerequisite for payment to royalty owners, from and after the effective date of July 1, 1989.

With these admissions, it would seem beyond question that the Court would hold that § 540 should be construed in a manner consistent with the existing common law. Basic axioms of statutory construction require it. Instead, however, the majority doggedly proceeds to its conclusion that under § 540, division orders are violative of public policy because, it holds, the only prerequisite for payment is demonstration of marketable title.

The effect of the majority opinion, as I view it, is the creation of a four year "window" (1985–1989) during which the law is different from what it was before and what it will be after. Different legislative enactments pertaining to the same subject, should be construed together as a harmonious whole. See, *Letteer v. Conservancy District No. 30*, Okl., 385 P.2d 796 (1963).

In addition to being erroneous, the majority's decision has unnecessarily inserted conflict and confusion in a stable and settled area of oil and gas law.

I agree with the trial court's interpretation of § 540. It simply requires proceeds derived from an oil and gas sale to be paid to persons "legally entitled thereto", no later than six months after the date of first purchase. Certainly the first purchaser may withhold proceeds when title is not marketable, but demonstration of marketable title alone is not sufficient in and of itself to cause an owner to be "legally entitled" to receive payment. Clearly then, under § 540 "causes" other than unmarketable title may exist which make an owner not "legally entitled" to receive payment for proceeds of production. Failure to execute a division order to purchaser to provide that purchaser with directions for payment and setting forth the terms and conditions for the purchase of royalty oil is one such "cause" under § 540 which must be met before a royalty owner would be "legally entitled" to be paid from proceeds.

Additionally, I am not persuaded by the majority's attempt to distinguish this matter from its recent decision in *Teel v. Public Service Company of Oklahoma*, Okl., 767 P.2d 391 (1985). I appreciate the tenuous position which Sun Oil must see itself occupying, in light of the holding of *Teel* and the language used therein. While it is true as the majority states, that the majority opinion in *Teel* did not find that the absence of a division order in and of itself was sufficient to sustain a finding of conversion—it *did* find that a division order is essential for a purchaser to protect itself against such a claim. Using the same pen, the majority in *Teel* stated:

"A division order consists of an agreement between the working interests and the purchasers which provides a formula for payment of the purchaser's price of gas. Its function is to protect the purchaser from liability. *Nonetheless, the purchaser is not protected unless the owners of the interest sign the division order.* In the absence of an executed division order and in the presence of no-

tice that the non-contracting cotenant has revoked the operator's right to sell, failure of a purchaser to account to each working interest owner for his/her pro rata share of the proceeds subjects the purchasers to the same liability as the operator and the purchaser may become a converter of the property." [At 397] Emphasis added.

In large part the instant case was at best a plea for declaratory judgment as to the abstract question of whether plaintiffs' proposed royalty division of interest form was superior to, or at least a sufficient replacement for, Sun's proposed division order. Plaintiffs' amended petition merely alleged that they submitted an executed royalty division of interest form to defendant but that defendant had refused to make royalty payments to the plaintiffs. The gist of much of the action before the trial court was not even to receive the relief granted here by the majority, but simply to obtain a judicial declaration of which form was better and which should be approved.

The Court uses "public policy" as a crutch to reach a result which is unsupportable. There is no factual basis in this record or in the contract in issue which justifies the pronouncement made today. The majority has failed to mention just what unfair or unfavorable conditions were attempted to be imposed upon these royalty owners under the guise of custom and usage which would justify such a result. Nothing in the majority opinion or in the record shows terms in the division order prepared by Sun Oil which were unfair or oppressive.

The recent amendment to § 540 is a clear statement and mandate of the public policy which has always existed in this State—including the years 1985 through 1989. I would affirm the trial court.

I am authorized to state that Vice Chief Justice OPALA, and Justice HODGES and Justice SUMMERS join with me in the views expressed herein.