Chester MAXWELL, Grace Maxwell Brown, Jewell E. Caudle, Waunette Johnson, James A. Maxwell, Patsy Davenport, and Bill Maxwell, Appellees,

v.

SAMSON RESOURCES COMPANY, Appellant.

No. 71180.

Supreme Court of Oklahoma.

March 16, 1993.

As Corrected April 6, 1993.

Allan DeVore, Randy Moeder, The De-Vore Law Firm, Oklahoma City, for appellees.

James A. Kirk, James M. Chaney, Kirk & Chaney, Oklahoma City, for appellant.

SIMMS, Justice:

Defendant below, Samson Resources Company (Samson) appeals the judgment rendered by the trial court in favor of the plaintiffs below/appellees, Chester Maxwell, Grace Maxwell Brown, Jewell E. Caudle, Waunette Johnson, James A. Maxwell, Patsy Davenport, and Bill Maxwell (the Maxwells). The trial court found that the Maxwells held a working interest in a gas-producing well and they were entitled to damages for Samson's failure as the operator of the well to pay working interest revenues to the Maxwells. The court included prejudgment interest on those revenues compounded monthly and trebled this total pursuant to 52 O.S.Supp.1985, § 540 and 52 O.S.Supp.1983, §§ 541–47.

The Court of Appeals affirmed the judgment except for the monthly compounding

of interest, modifying interest to be compounded annually. Certiorari was granted to consider whether error occurred in the determination of damages, including the prejudgment interest and treble damages. We find the trial court erred in computing interest on a compounded monthly basis and in trebling those damages. The opinion of the Court of Appeals is vacated, the judgment of the district court reversed, and the cause remanded.

### FACTS

George S. Maxwell died intestate in 1960 leaving his wife and nine children as his heirs. The appellees are either his children or grandchildren, and each is an heir. His estate, which included the property involved in this lawsuit, was never probated. In 1967, the decedent's wife, Louise Maxwell, transferred her interest in the property to Buster Maxwell, a son not a party to this action. Buster then transferred his interest in the property to F.E. Allen. Seventeen years later, the Maxwells filed a quiet title action in Pittsburg County District Court alleging they owned the property as heirs of George S. Maxwell. On June 5, 1985, the district court granted a default judgment to the Maxwells, finding they held interests in the property, including the minerals.

Prior to the quiet title action, Samson and several other oil and gas companies acquired leases to drill for and produce gas from the properties adjacent to and including the Maxwell's land. Kerr–McGee Corporation obtained a lease from F.E. Allen for his one-half interest in the property, and Samson was designated the operator for the gas well in a Joint Operating Agreement dated February 25, 1983.

A drilling title opinion received by Samson in January of 1984 showed a potential title defect regarding George S. Maxwell's estate. The attorney hired to do the title opinion recommended that a forced pooling action be instituted against the successors of George S. Maxwell and that in the event the well began producing, Samson should obtain a copy of the proceedings in the estate of George S. Maxwell or a transcript of the quiet title proceedings pertaining to the interests of George S. Maxwell in the well. Samson failed to follow this recommendation.

In February of 1984, the well, designated the Kinnikin. # 1, began producing, and Samson hired another law firm to prepare a division order title opinion setting forth the proper ownership for revenue distribution of the well proceeds. A letter from the opining attorneys suggested that Samson withhold payment to F.E. Allen for his share until Samson obtains a final decree or an affidavit of heirship and a copy of the will of George S. Maxwell showing his wife, Louise Maxwell, and son, Buster Maxwell, as sole heirs.

In response to these title problems, Samson's employees contacted Kerr–McGee representatives who provided rental receipts from F.E. Allen showing he held at least a one-half interest in the property. Samson claims it relied upon these rental receipts and Kerr–McGee's statement that F.E. Allen was the proper owner, making no efforts of its own to clear up the title question. Samson also asserts Kerr McGee was obligated to cure the title defect as the Joint Operating Agreement contained a clause stating that "[e]ach party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party." The agreement also provided that the party who contributed an interest which was lost through failure of title was responsible for curing the title or bearing the entire loss caused by it. This agreement, of course, cannot excuse Samson from its duties as operator under the provisions of the Oklahoma statutes.[1]

In August, 1985, an attorney representing the Maxwells notified Samson of the quiet title judgment and requested the Maxwells' share of the working interest revenues. Samson refused to pay the Maxwells any proceeds from the well attributable to their interest. Rather, Samson attempted to obtain gas leases from the Maxwells covering their property. However,

1. Fn. 2, Infra.

the Maxwells chose not to lease as they would only receive royalty payments under a lease.

In March of 1987, the Maxwells commenced this lawsuit against Samson and several other defendants. Samson agreed to indemnify the other defendants for any judgment held against them. Moreover, Samson stipulated that the Maxwells were entitled to working interest revenues and the only issue to be tried was how much revenues. Non-jury trial was had, and the trial court held in favor of the Maxwells, finding them entitled to share ratably in the production from the well.

The trial court found that gross total sales of gas were $10,991,566.52, and the Maxwells' share based upon their acreage ownership was $325,798.80. The evidence supports these findings. Hence, we will not disturb them on appeal. *Smith v. State ex rel. Department of Public Safety*, 680 P.2d 365 (Okla.1984).

Pursuant to 52 O.S.Supp.1985, § 540(A)[2], the trial court awarded interest on the sale proceeds at 6% from the date of first sales until May of 1985 on the grounds that title to the property did not become marketable until May 5, 1985 when the quiet title judgment was rendered. From May, 1985, and forward, interest was computed at 12% under 52 O.S.Supp.1985, § 540(B).[3] These interest figures were calculated on the basis of *monthly* compounding for a total interest figure of $119,178.87.

The trial court then gave Samson a set-off of $49,969.17 for the Maxwell's share of the costs and expenses of the well. No interest was tacked onto this amount because interest on costs and expenses is normally calculated from the date of billing. Since Samson never billed the Maxwell's for their share of the costs and expenses, the trial court disallowed any interest on the Maxwells' share of costs. Thus, the total working interest revenue damages award was $395,008.50.

Pursuant to 52 O.S.Supp.1983, § 547,[4] the trial court trebled the working interest

2. Subsection (A) of 52 O.S.Supp.1985, § 540 provides:

"The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production. Provided, such purchasers may remit to the persons entitled to such proceeds from production semiannually for the aggregate of six (6) months' accumulation of monthly proceeds of amounts less than Fifteen Dollars ($15.00). Further provided, that any delay in determining the persons legally entitled to an interest in such proceeds from production caused by unmarketable title to such interest shall not affect payments to persons whose title is marketable. Provided, however, that in those instances where such proceeds cannot be paid because the title thereto is not marketable, the purchasers of such production shall cause all proceeds due such interest to earn interest at the rate of six percent (6%) per annum, until such time as the title to such interest has been perfected. Marketability of title shall be determined in accordance with the then current title examination standards of the Oklahoma Bar Association. The first purchaser shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto."

3. Subsection (B) of 52 O.S.Supp.1985, § 540 provides:

"Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, calculated from date of first sale."

4. Title 52 O.S.Supp.1983, § 547 provides:

"The Corporation Commission is herein empowered to promulgate rules and regulations by which the purpose of this act shall be administered, including the power to establish and enforce penalties for violations thereof. Such power shall supplement the existing authority of the Corporation Commission to provide for a ratable taking of gas to protect the correlative rights of those entitled to take from a common reservoir or common source of supply, including the exercising of the authority to enforce balancing in kind. Such

damages for a total of $1,185,025.50. Additionally, the trial court adjudged Samson liable to the Maxwells for $8,837.18 in interest on late royalty payments as well.

### THE "SWEETHEART GAS BILL"

Samson argues several propositions of error regarding the trial court's interpretation and application of relevant statutes. A brief review of these statutes, 52 O.S.Supp.1985, § 540 and 52 O.S.Supp. 1983, §§ 541–47 is necessary before considering Samson's arguments. Sections 541 through 547 were enacted together by the legislature as one act which has come to be known as the "Sweetheart Gas Bill."[5] The purpose of the bill, as stated in § 541, is to protect the rights and correlative rights of all interest owners of natural gas wells, affording each the opportunity to extract and sell their proportionate share of gas.

Section 542 entitles each owner of a mineral interest in a gas producing well to share ratably in the revenues from the sale of the gas produced by the well and requires the operator of the well to give written notice to the owners of their right to have the operator market their gas for them. Similarly, §§ 543–45 govern the sales of gas under contracts and the accounting of gas sales, and § 545 directs the distribution of proceeds from sales under the provisions of § 540.

Section 540 calls for proceeds from the sale of gas to be paid to persons legally entitled thereto within six months after the date of first sale. Proceeds from any subsequent sales must be paid to the owners within sixty days of the end of the calendar month within which the gas was sold. The provision further reads:

> "Provided, however, that in those instances where such proceeds cannot be paid because the title thereto is not mar-

ketable, the purchasers of such production shall cause all proceeds due such interest to earn interest at the rate of six percent (6%) per annum, until such time as the title to such interest has been perfected." 52 O.S.Supp.1985, § 540(A).

Subsection D of § 540 provides for a 12% interest rate on unpaid revenues when the owners have marketable title.

### I.

### THE MAXWELLS WERE "OWNERS" OF THE PROPERTY

 Samson first argues the Maxwells were not "owners" in the gas well until July of 1985 when the district court quieted title in them. Since they were not owners in the well, Samson concludes that § 542 does not apply to them and they are not entitled to proceeds from gas produced prior to that month.

It is well settled that title to real property vests immediately in the heirs upon the death of an intestate. *Cassina v. Jones,* 340 P.2d 482 (Okla.1959); *Smyth v. Smyth,* 198 Okla. 478, 179 P.2d 920 (1947); *Davis v. Morgan,* 186 Okla. 30, 95 P.2d 856 (1939). *Smyth* further holds that although vesting immediately, "title is not absolute until determination of heirship and final distribution is had." 179 P.2d at 923 (citing *U.S. v. Drummond,* 144 F.2d 375 (10th Cir.1944), aff'd, *Drummond v. U.S.,* 324 U.S. 316, 65 S.Ct. 659, 89 L.Ed. 969 (1945)). In *U.S. v. Drummond,* the Tenth Circuit explained that although the heir is the *owner* of the property, they are not entitled to possession until all debts are satisfied and an order issued directing distribution of the property to them.

Hence, the holding in *Smyth* that title is not absolute merely means that the heir is

---

power shall not preclude the remedies available through the district courts as provided by existing law nor preclude the right, herewith granted, of any owner who is injured in business or property by any other owner in the well by reason of any action in violation of the provisions of this act to sue in the courts of this state and to recover threefold the damages so sustained, the costs of the suit, and reasonable attorneys fees to be fixed by the court."

**5.** In 1992, the Oklahoma Legislature enacted the "Natural Gas Market Sharing Act." *See* 1992 Okla.Sess.Laws, ch. 190, §§ 18–29. This act amended and recodified the provisions of the "Sweetheart Gas Bill" and added many more provisions to govern gas sales. *See, generally,* Hoefling, *Oklahoma's New Natural Gas Market Sharing Act,* 63 Okla.B.J. 2245 (July 25, 1992).

not entitled to enjoy all of the benefits of "ownership" until final distribution. As such, under the law of descent and distribution, the Maxwells, as heirs, are considered owners of the property.

In *Seal v. Corporation Commission*, 725 P.2d 278, 293 n. 33 (Okla.1986), we construed the term "owner" as used in 52 O.S.Supp.1983, §§ 542(A) and (D) to mean "parties who have a right to take their share of production in kind or to separately dispose of their share." Since the Maxwells were the rightful owners under probate law, they were entitled to the proceeds of any gas sales from the Kinnikin # 1 well after heirship was officially declared by the district court in July of 1985. Additionally, prior to the 1985 order, the Maxwells were owners although not entitled at that time to all of the benefits of ownership. Having been determined the proper heirs of the property, the Maxwells were entitled to those benefits which included proceeds from gas sales from the Kinnikin # 1 well both before and after the order of heirship.

## II.

## THE TRIAL COURT DID NOT ERR IN FINDING SAMSON LIABLE FOR GAS SALES FROM THE WELL

■ Next, Samson claims the trial court improperly awarded damages, interest and penalties to proceeds paid or payable pursuant to a contract between Arkla Energy Resources and Kerr McGee. Arkla contracted with Kerr McGee to purchase gas from the well, and Samson contends that some of the damages awarded were attributable to revenues paid by Arkla pursuant to this contract from March, 1985 through February, 1988. Samson fails to cite to any authority showing error by the trial court. Evidence upon this issue was presented, and the evidence tends to support the trial court's finding. Hence, we decline to disturb the trial court's ruling on appeal. *Smith v. State ex rel. Department of Public Safety*, 680 P.2d 365 (Okla.1984).

## III.

## UNDER SECTION 540, INTEREST SHOULD BE COMPOUNDED ANNUALLY RATHER THAN MONTHLY

■ The Court of Appeals reversed and remanded the trial court's judgment as to the way interest should be computed. Samson does not take issue with the Court of Appeal's holding that interest is to be computed on a compounded *yearly* basis. Therefore, we need not address the issue and merely hold that interest under § 540 is to be compounded annually rather than monthly. Because the trial court compounded interest monthly, the judgment is modified to compute interest by compounding *annually.*

## IV.

## THE TREBLE DAMAGES PROVISION OF SECTION 547 MAY NOT BE IMPOSED WITHOUT SOME EVIDENCE OF WRONGFUL INTENT

■ Samson next asserts *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), requires a finding of wrongful intent before treble damages may be imposed. In *Morissette*, the United States Supreme Court overturned a conviction for "knowingly converting" United States property because the trial court refused to submit "intent" as an element of the crime to the jury. Because *Morissette* involved a criminal conviction as opposed to penalty damages as this case does, we will not base our decision upon the rationale of that decision. Rather, we look to the common law and statutes analogous to § 547 for guidance.

Section 547 states that the power afforded to the Corporation Commission to promulgate rules to administer the act:

> "*shall not preclude* the remedies available through the district courts as provided by existing law nor preclude *the right, herewith granted, of any owner who is injured in business or property by any other owner* in the well by reason of any action *in violation of the provisions of this act* to sue in the courts of this state and *to recover threefold the damages so sustained,* the costs

of the suit, and reasonable attorneys fees to be fixed by the court." (Emphasis added)[6]

■ Section 547 authorizes the district court to impose a penalty of three times the amount of damages actually sustained. As such, the statute is penal in nature and must be strictly construed. *State ex rel. Thompson v. Ekberg,* 613 P.2d 466 (Okla.1980). *See also Wagoner v. Bennett,* 814 P.2d 476 (Okla.1991) (statute allowing double damages for wrongful eviction was penal in nature); *Slocum v. Phillips Petroleum Co.,* 678 P.2d 716 (Okla.1983) (exemplary damages are highly penal and punishment thereof should not be lightly imposed).

In the case at bar, the Oklahoma Court of Appeals determined that treble damages were permissible regardless of any evidence of wrongful intent. This conclusion came from their reading of language this Court used in *Seal v. Corporation Commission,* 725 P.2d 278 (Okla.1986). In *Seal,* we held that the Sweetheart Gas Bill was constitutional, further noting:

> "The practical effect of different standards for measuring liability in district court and the Commission would force parties to seek their remedies in district court where treble damages may be recovered without fault." 725 P.2d at 298.

The Court of Appeals interpreted this language to mean that the trebling provision of § 547 is to be imposed regardless of any fault or motive on the part of the well operator. However, the holding of *Seal* does not support such a construction. *Seal* specifically struck down a rule promulgated by the Corporation Commission pursuant to authority given by § 547. The rule was disallowed because it required a mineral interest owner to prove that its loss was the result of the operator's "gross negligence or willful misconduct" in order to win any damages in a suit against the operator. Since the rule imposed a standard for measuring liability in the Corporation Commission which did not exist in the district court under § 547, it was declared invalid.

6. After the 1992 amendments and recodification, § 547 is now found at 52 O.S.Supp.1992, § 581.10. The amendment *eliminates the treble damages provision* so that now an aggrieved

The above-quoted language which implies that § 547 imposes treble damages regardless of fault was *dicta* and was not meant as an interpretation of the grant of treble damages in § 547. Rather, it set forth the distinction between the Corporation Commission's rigorous standard and the statute's lack of an explicit standard.

■ Section 547 does not automatically award treble damages to an owner on a mere showing that the operator owes him revenues. Rather, it prohibits the Corporation Commission from promulgating rules which are more restrictive than the owner's right to recover treble damages under § 547. Although the statute gives no indication as to what circumstances warrant recovery of treble damages, we cannot assume the legislature intended for treble damages to be imposed without some finding of intentional or wrongful conduct. Indeed, some form of wrongful intent or conduct must be shown to award treble damages as an example or punishment. *See Oller v. Hicks,* 441 P.2d 356, 360 (Okla.1967), which holds:

> "The basis for allowance of punitive damages rests upon the principle that they are allowed as a punishment for the benefit of society as a restraint upon the transgressor, and a warning and example serving as a deterrent to commission of like offenses in the future.... When a defendant's conduct is such as to amount to fraud, oppression or malice, or the act is wilfully and wantonly done with criminal indifference to the plaintiff's rights, exemplary damages are allowable." (Citations omitted).

Exemplary damages "are designed to discourage, among other things, the wilful and wanton invasion or disregard of the rights of others." *Main v. Levine,* 189 Okla. 564, 118 P.2d 252, 255 (1941). The U.S. Supreme Court defines punitive damages as "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct.

owner *may only recover actual damages* sustained against an owner or producer who violates the provisions of the act.

2997, 3012, 41 L.Ed.2d 789 (1974). Moreover, 22 Am.Jur.2d *Damages* § 816 (1988) explains the application of treble damages as follows:

> "Statutory double or treble damages, like exemplary damages generally, are confined to cases where some element of recklessness, wantonness, willfulness, or evil design entered into the act when it was committed."

Several Oklahoma statutes provide for exemplary damages. Title 23 O.S.1991, § 9 allows exemplary damages where the defendant's conduct evinces "a wanton or reckless disregard for the rights of another," among other things. Under § 9, this Court has upheld exemplary damages awards for recklessness, *Sunray DX Oil Co. v. Brown*, 477 P.2d 67 (Okla.1970), and for gross negligence, *Pennsylvania Glass Sand Corp. of Oklahoma v. Ozmet*, 434 P.2d 893 (Okla.1967). Numerous other decisions, some relying upon § 9, have held that some form of wrongful intent or recklessness is necessary before exemplary damages are allowed.

In strictly construing 23 O.S.1931, § 71, which grants treble damages to a person who is forcibly ejected or excluded from the possession of real property, this Court reversed a judgment for plaintiff because the instructions given provided for recovery of treble damages on a mere showing of ejectment. *Crow v. Davidson*, 186 Okla. 84, 96 P.2d 70 (1939). We noted that a showing of "force" was necessary to warrant treble damages and reversed the judgment where the instructions did not include the element of force.

Another statute, 23 O.S.1991, § 72 provides for treble damages for wrongful injuries to timber, trees or underwood, "except where the trespass was casual and involuntary." In *Robinson v. Spittler*, 191 Okla. 278, 129 P.2d 181 (1942), this Court construed § 72 to allow treble damages against a defendant who conveyed standing timber to another without the consent of the owner when that defendant made the conveyance "with full knowledge" that he neither owned the timber or had authority to convey. 129 P.2d at 184. Even though the defendant did not enter onto the land

and cut the timber down, he was held liable under the statute for his wrongful actions. Thus, under § 72, the trier of fact must specifically find intent on the defendant's part in trespassing and damaging timber.

These cases are just a few examples of statutes allowing multiple or exemplary damages where one person's actions cause damage to another person's property or violates their rights. In each, some degree of wrongful intent was necessary in order to warrant the exemplary damages. Our construction of § 547 must require no less.

Therefore, based upon considerations of fundamental fairness in penalizing one for their actions, and giving due weight to the legislature's recent repeal of multiple damages in cases such as this one, we hold that treble damages may not be imposed under § 547 on a mere showing that revenues have not been paid from the proceeds of gas sales. Rather, some degree of wrongful intent or motive must be proven by an owner in a gas well to recover threefold damages.

■ We need not determine at this time what degree of wrongful intent is necessary to warrant treble damages under § 547 because the trial court made no finding of wrongful intent or motive for us to review. The trial court noted that he was uncertain as to any motive or intent on Samson's part, and a specific finding of wrongful intent, wrongful motive, willfulness or wantonness was never memorialized in the Journal Entry of Judgment. There being no factual finding upon which to base a ruling, we must hold that treble damages were improperly imposed on Samson. Hence, the trial court erred in trebling the damages where no findings of wrongfulness were made, and that portion of the trial court's judgment granting treble damages is reversed.

Since we are reversing the treble damages, we need not address other propositions concerning the constitutionality of § 547 or the imposition of treble damages upon prejudgment interest allowed under § 540.

Appellee's motion to dismiss this appeal for failure by Samson to timely assure the record on appeal was ready for submission is DENIED.

For the above and foregoing reasons, the opinion of the Court of Appeals is VACATED, the judgment of the trial court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

HODGES, C.J., LAVENDER, V.C.J., and HARGRAVE, ALMA WILSON and SUMMERS, JJ., concur.

KAUGER, WATT, JJ., concur in part, dissent in part.

OPALA, J., concurs in 1, 2, and 3; dissents as to 4.