A.R. HEIMAN, Neva L. Harris, Nina L. Kridler, John Chiaf, G.R. Brecheisen, Lee O. Brecheisen, A.E. Martin, Joe S. Snider, George D. Gallaspy, Hugh Howard, III, R.C. Bradley, Trustee of the R.C. Bradley Revocable Trust, Dated

---

12/1/79, F.M. Tarpley, Trustee of the F.M. Tarpley Revocable Trust, Dated 12/1/79, Amroy Co., an Oklahoma Corporation, Gallaspy Oil Properties, Ltd., an Oklahoma Limited Partnership, Latigo Oil & Gas Exploration Program, Ltd., an Oklahoma Limited Partnership, Appellees,

v.

ATLANTIC RICHFIELD COMPANY, a Delaware Corporation, ANR Production Company, a Delaware Corporation, Edwin L. Cox, Natomas North America, Inc., a California Corporation, Ricks Exploration C., an Oklahoma Corporation, Sabine Production Company, a Louisiana Corporation, Woods Petroleum Corp., a Delaware Corporation, Appellants,

and

Tenneco Oil Company, a Delaware Corporation, Defendant.

No. 70739.

Supreme Court of Oklahoma.

March 7, 1995.

As Corrected March 14, 1995.

Val R. Miller, Harvey D. Ellis, Mark D. Christiansen Crowe & Dunlevy, P.C., Oklahoma City, Michael Burrage, Stamper, Otis & Burrage, Antlers, Eugene Kuntz, Norman, for appellants, except ANR Production Co.

William R. Elias, Watson & McKenzie, Oklahoma City, for appellant, ANR Production Co.

David L. Fist, Mark S. Rains, Rosenstein, Fist & Ringold, Tulsa, for appellees.

Phillip D. Hart, Stanley L. Cunningham, Gary W. Catron, McAfee & Taft, Oklahoma City, for amicus curiae, Mid–Continent Oil & Gas Assoc.

SUMMERS, Justice.

The issue is whether the trial court correctly held that Appellants ARCO & ANR (ARCO) are liable for the payment of interest at the rate of 12% for the period from May 3, 1983 until January 20, 1988 on gas proceeds for Appellees' (Heiman's) ratable share of gas produced and sold during the period from April 5, 1982 to May 3, 1983. We affirm the trial court's judgment that Heiman is entitled to prejudgment interest on the proceeds from May 3, 1983 until January 20, 1988, but reverse as to the rate of the interest, and hold that interest at 6% is proper.

Heiman filed this action on September 14, 1984, seeking an accounting and cash-balancing payment for its pro rata share of proceeds from gas produced and sold from the Petree No. 1–35 well in Dewey County from April 5, 1982, to May 3, 1983, together with all interest accrued and accruing. The parties filed a joint stipulation of facts, which they stipulated were in connection with and in addition to the undisputed facts set forth in Heiman's summary judgment motion and ARCO's response brief. The parties stipulated that Heiman's pro rata share of the subject gas proceeds is $535,496.23, and that on or before January 28, 1988, ARCO would pay that amount. The only remaining issue was whether interest was recoverable and if so, when it would start and at what rate, all agreeing that January 20, 1988 would be the cutoff date for any interest calculation.

The trial court granted summary judgment in favor of Heiman and against ARCO in the amount of $303,164.09 for interest on the principal sum, calculated at the rate of 12% per annum from May 3, 1983 to January 20, 1988, citing 23 O.S.1981, § 6 and *Beren v. Harper Oil Co.*, 546 P.2d 1356 (Okla.App. 1975), (released for publication by Court of Appeals and published as corrected on limited grant of certiorari from the Supreme Court). ARCO timely appealed the summary judgment. The Court of Appeals dismissed the appeal. We vacated the dismissal opinion of the Court of Appeals, and retransferred the appeal to the assigned division of the Court of Appeals for review on the merits. *Heiman v. Atlantic Richfield Co.*, 807 P.2d 257 (Okla.1991). Relying upon Rule 6–104(F) of the Oklahoma Corporation Commission, and noting that *Seal v. Corporation Commission*, 725 P.2d 278, 298 (Okla. 1986) did not specifically invalidate the "without interest" portion of Rule 6–104(F), the Court of Appeals reversed the summary judgment.

The relevant facts are that Heiman and ARCO were working interest owners in the Petree No. 1–35 well. Production commenced on April 5, 1982 and ceased on March 31, 1987. The parties designated ARCO as operator of the well. The operating agreement provided that each party may take in kind or separately dispose of the gas,

and that the operator may elect to sell another party's share of gas. There is no provision in the operating agreement for the balancing of gas production interests should an imbalance occur.

Beginning with the first production in April, 1982, ARCO produced, sold and received revenue for 100 per cent of the allowable production from the Petree Well. Heiman did not make arrangements to take in kind. Heiman attempted to dispose of the gas by its own contract with ARCO's gas purchaser, Michigan–Wisconsin, but ARCO withheld its approval of the contract, and Michigan–Wisconsin declined to buy without ARCO's approval. After the start of production Heiman made repeated · demands on ARCO for their proportionate share of proceeds, but ARCO refused to distribute any gas ·proceeds to Heiman. After one year of production, on May 3, 1983 the "Sweetheart Gas Act" [1] went into effect requiring ratable sharing of revenues from gas production. ARCO distributed production revenue to Heiman for the production months of May, 1983 through depletion of the Petree Well No. 1–35 on March 31, 1987. ARCO refused to make distribution to Heiman for the production revenue for the sales occurring between April 5, 1982, and May 3, 1983. Heiman filed this action in September, 1984 and sought a cash-balancing prior to depletion. In January, 1988, ARCO stipulated that Heiman's proportionate share of the revenue for gas produced from April 5, 1982 until May 3, 1983 equals $535,496.23, without interest.

The parties argue over Oklahoma Corporation Commission's Rule 6–104(F) and the application of prejudgment interest under 23 ·O.S.1981, § 6. Heiman contends that a right to cash-balancing vested on the effective date

of the "Sweetheart Gas Act" on May 3, 1983, and therefore ARCO is liable for interest under 23 O.S.1981, § 6. ARCO responds that the 12% interest provision in 52 O.S.Supp.1980, § 540 was superseded by Rule 6–104(F) of the Oklahoma Corporation Commission, and thus no interest accrued. ARCO also asserts that Heiman's right to its share of the gas revenues did not vest until depletion in March, 1987, and that Heiman is not entitled to prejudgment interest calculated from May 3, 1983.

Rule 6–104(F), relied upon by ARCO, required cash balancing, without interest, on well depletion for wells commencing production prior to May 3, 1983. *Seal v. Corporation Commission,* 725 P.2d at 296 n. 40. But there are two impediments to its application in this case.

First, this rule was held invalid in *Seal* as contrary to the payment provisions of the Sweetheart Gas Act, and no language of that opinion leaves the rule intact for other purposes. *Seal v. Corporation Commission,* 725 P.2d at 296. Secondly, this rule was adopted to administer the provisions of the Sweetheart Act with an effective date for the rule of January 1, 1984. *Seal,* 725 P.2d at 292–293. In our case the parties stipulated that Heiman had a right to a certain sum due for his share of the production prior to May 3, 1983. Heiman's right did **not** arise from the Sweetheart Gas Act. It was based on pre-Act production, and in *Seal* we declared that Act to operate prospectively, i.e. from May 3, 1983 and after. *Seal,* 725 P.2d at 294. We reject ARCO's position that the rule operated retroactively and independently of the Act.[2] Neither the Sweetheart Act nor an invalid rule adopted to implement that Act apply to this pre-Act production revenue.

---

**1.** 52 O.S.Supp.1983, §§ 541–547. We note that since this controversy arose two statutory schemes have been enacted relevant to proceeds from production, the Production Revenue Standards Act, 52 O.S.Supp.1994 § 570.1—§ 570.15, and the Natural Gas Market Sharing Act, 52 O.S.Supp.1994 §§ 581.1—581.10. *See Maxwell v. Samson Resources Company,* 848 P.2d 1166, 1170 (Okla.1993). Our holding herein does *not* rely upon these Acts.

**2.** ARCO argues that while the Act is not retroactive a Commission Rule created under the authority of the Act is retroactive. Such an argument requires an examination of the express provisions of the statutes to determine if administrative authority to create such a rule was granted. See *Good Samaritan Hospital v. Shalala,* —— U.S. ——, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993); *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). ARCO has not drawn our attention to

The parties also argue over whether 52 O.S.1981 § 540 applies here.[3] The language of the statute shows its nonapplicability. Section 540 applies when a sale occurs and a person is entitled to share in the proceeds of that sale **when the sale occurs.** This section states that the proceeds of sale of production "shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold." During the period between April 5, 1982, and May 3, 1983 was Heiman "legally entitled" to a portion of the sale proceeds at the time of these sales?

◼ In *Seal* we explained why the Sweetheart Act came into being, and said that prior to the Act (as is the case here) under gas balancing contracts the non-selling owners were denied the use of funds from the sales, balancing of rights occurred upon well depletion, and "there was no guaranty that the selling owners who received more than their pro rata share of proceeds would be capable, regardless of the obligation, to satisfy their liabilities after balancing of rights." *Seal*, 725 P.2d at 285. The Sweetheart Act was to remedy this by requiring revenue distribution upon sale. This means that, in the absence of an agreement to the contrary, a pre-Act sale such as this was not the sale of gas belonging to the underproduced party. Our opinions are consistent with this view. See *Anderson v. Dyco Petroleum*, 782 P.2d 1367, 1372 (Okla.1989) where we explained remedies for interest owners, and the rights of each cotenant to develop and market production. This summarizes the general rule that pre-depletion cash-balancing was not required for every well prior

to the Sweetheart Act. Pursuant to this rule ARCO did not sell gas to which Heiman was legally entitled between April 5, 1982, and May 3, 1983. Section 540 does not apply because Heiman was not legally entitled to share in the sale proceeds on the dates of sale occurring between April 5, 1982, and May 3, 1983.

◼ The trial court awarded interest, and stated its reliance upon 23 O.S.1981, § 6 and *Beren v. Harper Oil Co., supra. Beren* is an exception to the pre-Act general rule, and explains that a court may order predepletion cash-balancing, and that such an order is one in equity based upon the circumstances of the particular case before the court. *Beren*, 546 P.2d at 1359–1360. *See also Anderson v. Dyco Petroleum*, 782 P.2d at 1373; *United Petroleum Exploration v. Premier Resources*, 511 F.Supp. 127, 130–131 (W.D.Okla. 1980). *Cf. Doheny v. Wexpro Company*, 974 F.2d 130, 133 (10th Cir.1992), (balancing in kind is the preferred method of balancing unless the equities dictate otherwise). By its reliance upon *Beren* **and awarding prejudgment interest from May 3, 1983** the trial court made the determination that Plaintiffs were entitled to a predepletion periodic cash-balancing because the equities called for this balancing on May 3, 1983.

◼ ARCO disputes whether an equitable proceeding for pre-depletion cash-balancing was cognizable. In *Anderson v. Dyco Petroleum, supra*, we described the three methods of balancing as industry practices recognized by the courts, including periodic cash-balancing. Pre-depletion cash-balancing as industry custom and usage is incorporated into the joint operating agreement (JOA).[4] The JOA's silence on periodic equi-

any express language in the Sweetheart Act granting authority to the Commission to make retroactive rules. An agency's authority to make rules under statutory authority is limited to the authority granted by those statutes, and such rules may not be contrary to those statutes. *Northwest Datsun v. Oklahoma Motor Vehicle Commission*, 736 P.2d 516, 520 (Okla.1987); *Adams v. Professional Practices Commission*, 524 P.2d 932, 934 (Okla.1974). In light of *Seal v. Corporation Commission, supra*, and ARCO's fail-

ure to point to specific language of the Act we need not address this argument further.

3. Section 540 is discussed in *Fleet v. Sanguine, Ltd.*, 854 P.2d 892 (Okla.1993).

4. *See Hull v. Sun Refining and Marketing Co.*, 789 P.2d 1272, 1278 (Okla.1989), (custom and usage is part of the common law); *Buckles v. Wil–Mc Oil Corp.*, 585 P.2d 1360, 1362 (Okla.1978), (the

table cash-balancing does not strip a party of that equitable remedy incorporated into the agreement.[5] Additionally, we note that we have previously rejected an argument claiming that an action for an accounting was premature when brought prior to well depletion. *Frost v. Ponca City*, 541 P.2d 1321, 1324 (Okla.1975). We thus reject ARCO's argument that prior to the Sweetheart Act the sole remedy for the underproduced interest owners was a proceeding for an accounting upon well depletion.

■ The imbalance in production between ARCO and Heiman ended on May 3, 1983, with no foreseeable imbalances for these parties. Periodic cash-balancing was not the only remedy recognized for such imbalance, and Heiman could have taken in kind or waited for well depletion to seek such balancing. *Anderson v. Dyco Petroleum, supra.* Heiman stated that prior to May 3, 1983, it had made repeated demands upon ARCO to allow Heiman to contract with Michigan–Wisconsin and for periodic cash-balancing payments. ARCO was notified that Heiman selected periodic cash payments for balancing and would not wait for well depletion. ARCO also knew of the inability of Heiman to make-up the imbalance through sales of gas. The trial court's judgment stated that interest began to run from May 3, 1983, and this necessarily includes a finding that the equities supported cash-balancing on that date. See *Archer v. Archer*, 813 P.2d

1059, 1062 (Okla.App.1991) (approved for publication by order of Supreme Court.)

■ Generally, prejudgment interest is not awarded in the absence of statutory authority. *Dyco Petroleum Corp. v. Smith*, 771 P.2d 1006, 1009 (Okla.1989). Interest may run from the date that the claim was both certain and the party had a right to the principal. 23 O.S.1981 § 6; *Champlin Refining Co. v. Phillips Petroleum Co.*, 269 P.2d 993, 996 (Okla.1954). The statute relied on by the trial court, 23 O.S. § 6, only applies to claims for ascertainable or liquidated amounts.[6]

Heiman showed that ARCO kept track of the monthly sales prior to May 3, 1983. ARCO did not directly contradict this assertion. The claim for underpayment of revenues was capable of being made certain by calculation on May 3, 1983, and interest was proper under 23 O.S.1981 § 6. This result is consistent with our recent opinion in *Shanbour v. Phillips 66 Natural Gas Co.*, 864 P.2d 815 (Okla.1993).

■ ARCO argued in the trial court that if an interest rate did apply the 6% rate of 15 O.S.1981 § 266 was proper.[7] Heiman argued for a greater rate because of market conditions. Heiman's argument is not persuasive. *Carter v. City of Oklahoma City*, 862 P.2d 77, 81 (Okla.1993). The JOA does not provide an interest rate, and we agree with ARCO that the rate of 6% provided by § 266 applies to these Plaintiffs.

applicable law is a part of every contract); *LaVelle v. Fair Oil Company*, 388 P.2d 13, 16 (Okla. 1963), (the applicable law part of every contract includes custom and usage incorporated into the common law).

5. Silence on an issue of applicable law in an agreement will not negate that law; rather a contractual adjustment of rights contrary to law must be clearly expressed in the agreement before applicable law will not apply. *Founders Bank and Trust Co. v. Upsher*, 830 P.2d 1355, 1364 n. 32 (Okla.1992). Exceptions to incorporating custom and usage into the agreement via the common law are not before us and we need not explain their application. *But see, Hull v. Sun Refining and Marketing Co.*, 789 P.2d at 1279; *Seal v. Corporation Commission*, 725 P.2d at 291; *Tenneco Oil Company v. El Paso Natural Gas Company*, 687 P.2d 1049, 1054 (Okla.1984).

6. 23 O.S. § 6 states:

Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

7. Section 266 states:

The legal rate of interest shall be six percent (6%) in the absence of any contract as to the rate of interest, and by contract the parties may agree to any rate as may be authorized by law, now in effect or hereinafter enacted.

Certiorari is granted and the opinion of the Court of Appeals is vacated. The judgment of the District Court is affirmed in part and reversed in part, and the cause remanded for entry of judgment consistent with this writing.

HODGES, LAVENDER, SIMMS, HARGRAVE, SUMMERS and WATT, JJ., concur.

KAUGER, V.C.J., and OPALA, J., concur in part, dissent in part.

ALMA WILSON, C.J., dissents.

ALMA WILSON, Chief Justice, dissenting to opinion on rehearing:

This action was initiated in September, 1984, by a group of working interest owners (Heiman) against the operator (ARCO) to recover their respective shares of gas production proceeds. ARCO stipulated that Heiman was entitled to receive $535,496.23 as their pro rata share of the proceeds for gas produced and sold from April 5, 1982, to May 3, 1983. In January, 1988, ARCO paid Heiman $535,496.23, but refused to pay any interest which may have accrued prior to the date of payment. Because the interest issue in this case is controlled by 52 O.S.1981, § 540, I must respectfully dissent to today's opinion on rehearing.

Heiman and ARCO were working interest owners in the Petree No. 1–35 well, in Dewey County, Oklahoma. The parties designated ARCO as operator of the well in their operating agreement dated December 17, 1980. The operating agreement provided that each party may take in kind or separately dispose of the proportionate share of gas produced and in the event any party failed to make arrangements necessary to take in kind or separately dispose of its proportionate share, that the operator may sell it for the account of the non-taking party. The operating agreement expressly excluded a gas balancing provision and was silent as to cash balancing.

Production commenced on April 5, 1982. Heiman did not take in kind, nor make arrangements to separately dispose of its share of the production. Heiman did, however, make several attempts to separately dispose of their gas by contract with ARCO's gas purchaser, Michigan–Wisconsin before and after production commenced. Michigan–Wisconsin would not contract with Heiman without ARCO's consent and ARCO refused to consent to the contract. Beginning with the first production, ARCO sold 100 per cent of the gas production to Michigan–Wisconsin. Heiman made repeated demands on ARCO for their proportionate share of the production proceeds, but ARCO refused to distribute any gas proceeds to Heiman.

Enacted in 1980,[1] 52 O.S.1981, § 540 was in effect throughout the involved production period. Section 540 required distribution of production proceeds to persons legally entitled thereto within six months after the commencing of production. The applicable version of § 540 read:[2]

A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production. Provided, such purchasers may remit to the persons entitled to such proceeds from production semiannually for the aggregate of six (6) months' accumulation of monthly proceeds of amounts less than Fifteen Dollars ($15.00). Further

---

1. 1980 Okla.Sess.Laws, ch. 205, § 1.

2. Section 540 was amended in 1985, by adding new language to clarify that the 12% interest is to be calculated from the date of first sale. 1985 Okla.Sess.Laws, ch. 141, § 1. Section 540 was further amended and renumbered by 1992 Okla. Sess.Laws, ch. 190, §§ 10 and 28, effective July 1, 1993, and is now codified at 52 O.S.Supp. 1992, § 570.10, of the Production Revenue Standards Act, 52 O.S.Supp.1992, § 570.1, et seq.

provided, that any delay in determining the persons legally entitled to an interest in such proceeds from production caused by unmarketable title to such interest shall not affect payments to person whose title is marketable. Provided, however, that in those instances where such proceeds cannot be paid because the title thereto is not marketable, the purchasers of such production shall cause all proceeds due such interest to earn interest at the rate of six percent (6%) per annum, until such time as the title to such interest has been perfected. Marketability of title shall be determined in accordance with the then current Title Examination Standards of the Oklahoma Bar Association. The first purchaser shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto.

B. Any said first purchaser or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, as the penalty.

C. The district court for the county in which the oil or gas well is located shall have jurisdiction over all proceedings brought pursuant to this act. The prevailing party in any proceeding brought pursuant to this act shall be entitled to recover any court costs and reasonable attorney's fees.

Section 540 required Michigan–Wisconsin, as the first purchaser, or ARCO, as the operator, to distribute proceeds derived from the sale of the gas production to Heiman, persons legally entitled thereto. Michigan–Wisconsin paid 100 per cent of the proceeds to ARCO because ARCO refused to authorize the first purchaser to pay Heiman their proportionate share.

Notwithstanding the dictates of § 540 and the demands for payment by Heiman, ARCO held Heiman's half a million dollars for at least five years. On rehearing, ARCO asserts that industry custom and usage was presumptively included in the operating agreement and therefore Heiman had no right to the proceeds until depletion. Although ARCO presented no evidence of industry custom and usage before the trial court, on rehearing ARCO explains that industry custom declared that ARCO, the operator, was the owner of 100 per cent of the gas which it produced and sold and that Heiman, working interest owners who failed to take in kind or separately dispose of their share of the gas, were not entitled to receive any production proceeds until depletion of the well.

This unproven industry custom[3] flies in the face of § 540. Subsection B of § 540 clearly provides that if ARCO, the operator, the owner of the right to produce, refuses to distribute production proceeds as it did herein, then ARCO shall be liable to the persons legally entitled to the proceeds from production, Heiman, for the unpaid amount of such proceeds, half a million dollars, with interest thereon at the rate of twelve percent (12%) per annum.

ARCO apparently recognized the distribution dictates of § 540 on May 3, 1983, even though ARCO continues to assert the contrary industry custom on rehearing herein.

---

**3.** The court has a duty to recognize established business practices. *Goss v. Trinity Savings & Loan Association,* 813 P.2d 492 (Okla.1991). The party relying upon industry custom has the duty to plead and prove the existence of the custom. *Fellers v. St. Louis–San Francisco Ry. Co.,* 572 P.2d 972 (Okla.1977); *Clemson v. Century Petroleum Co.,* 179 Okla. 193, 64 P.2d 1219 (1937).

On May 3, 1983,[4] Heiman and Tenneco, ARCO's gas purchaser at that time, executed a division order for the distribution of proceeds to Heiman.[5] Tenneco distributed production proceeds to Heiman for the production months of May, 1983 through depletion of the well on March 31, 1987. But, ARCO continued to hold Heiman's half a million dollars from the gas sales that had occurred between April 5, 1982, and May 3, 1983, while Heiman continued to make demands for those revenues and ultimately filed this action in September, 1984.[6]

Enactment of 52 O.S.Supp.1983, §§ 541–547 clearly signaled the demise of abusive industry customs such as that asserted by ARCO herein. Not only did ARCO recognized the impropriety of its industry custom on May 23, 1983, but so did this Court.[7] In *Seal v. Corporation Commission* we unequivocally rejected the industry custom—delaying distribution of production proceeds until depletion—relied upon by ARCO.[8] In *Seal v. Corporation Commission*, we concluded that the 52 O.S.Supp.1983, §§ 541–547 **and**

§ 540, enacted prior thereto, required distribution of production proceeds before depletion.[9]

We believe the Legislature in enacting Section 545 clearly incorporated the time frame provisions of Section 540 into the gas [cash] balancing scheme. We conclude the various time frames in which payment is to be made as set forth in the challenged Rules are inconsistent with the provisions of Section 540 as incorporated by Section 545 and are thus invalid.

*Seal v. Corporation Commission,* 725 P.2d at 296.

ARCO, argues that, even if Heiman's right to a ratable share of the proceeds of past production sales vested on May 3, 1983, § 540 is not applicable because the operating agreement imposed an absolute obligation on Heiman to take the gas in kind or to market it, which Heiman failed to do. The operating agreement clothed ARCO with the right to sell the gas for Heiman, if Heiman failed to take in kind or separately dispose of it. ARCO exercised the right to sell Heiman's share of gas production **on account** for Hei-

---

4. The "Sweetheart Gas Bill" went into effect on May 3, 1983, requiring ratable sharing of revenues from gas production. 52 O.S.Supp.1983, §§ 541–547. Even though these statutes have been amended several times since the first enactment, the provisions granting interest owners the right to ratably share in gas produced and sold and requiring ratable sharing of proceeds under § 540 remain intact. Most recently, these statutes were amended and/or renumbered by 1992 Okla.Sess. Law, ch. 190, § 19 et seq., effective September, 1992, and are now codified within the Natural Gas Market Sharing Act, 52 O.S.Supp.1992, § 581.1, et seq.

5. Under the facts in this case, ARCO's recognition that it was not entitled to withhold distribution of proceeds from Heiman is implicit in the signing of the division order. In *Hull v. Sun Refining and Marketing Co.,* 789 P.2d 1272, 1280 (Okla.1989), this Court said that the custom and usage which required the execution of a division order as a condition precedent to payment of royalty proceeds did not survive the enactment of § 540; and, concluded that the requirement that lessors execute division orders before proceeds will be paid conflicts with the spirit and letter of § 540 and is contrary to public policy intended to promote prompt payment of oil and gas proceeds.

6. Pursuant to § 540, six months after first production Heiman could have filed an action for

distribution of its proportionate share of the proceeds plus interest at the rate of 12 per cent per annum.

7. *Seal v. Corporation Commission,* 725 P.2d 278 (Okla.1986).

8. One of the issues in *Seal* was a challenge to the Oklahoma Corporation Commission's Rule 6–104, captioned "Gas Statements of Production." Rule 6–104 required interest owners who produce and separately sell or otherwise dispose of gas to maintain an accounting of the volumes of gas produced and sold and to provide monthly statements to all requesting owners. Subsection F. required a final balancing of production sales which occurred prior to May 3, 1983, to be achieved through a cash balancing, without interest, when production permanently ceases.

9. In *Seal,* we held that the "Sweetheart Gas Bill" is not retroactive. The retroactivity of § 540 is not at issue. *Teel v. Public Service Co. of Oklahoma,* 767 P.2d 391, 399 (Okla.1985). The original 1980 version of § 540 was in effect when the "Sweetheart Gas Bill" became effective and at the involved production times and at the time this suit was filed.

man, according to the operating agreement. Nothing in the operating agreement clothed ARCO with the right to hold half a million dollars of production proceeds for five years.

ARCO failed to promptly distribute the gas proceeds to Heiman in accordance with the requirements of 52 O.S.1981, § 540. Upon the effective date of 52 O.S.Supp.1983, §§ 541–547, ARCO recognized it could no longer refuse to distribute production proceeds to Heiman. On that date ARCO permitted the first purchaser to distribute proceeds to Heiman thereby recognizing that the operating agreement did not authorize the withholding of proceeds from Heiman. And, on that date the amount of proceeds due Heiman from the past sales was readily ascertainable.[10] Accordingly, I would find that ARCO is liable to Heiman for interest on the undistributed production proceeds from May 3, 1983 until January 20, 1988 at the rate of 12% per annum. I would affirm the trial court's summary judgment in favor of Heiman for interest at the rate of 12% from May 3, 1983 until January 20, 1988.[11]

---

10. Both the trial court and the Court of Appeals found that Heiman's ratable share of the sales proceeds was readily ascertainable by ARCO and ARCO does not dispute this finding.

11. It appears that the trial court granted interest at the rate established by 52 O.S.Supp.1980, § 540. If interest had been calculated under the prejudgment interest statute, 23 O.S.1981, § 6, the court would have been required to utilize annual rates set by statute for 1983, 1984 and 1985 and rates determined by the Court Administrator for 1986, 1987 and 1988. 12 O.S.Supp. 1986, § 727. However, on appeal, the trial court judgment will be affirmed if it is supported upon any legal theory, regardless of the legal authority upon which the trial court pronounced judgment. 12 O.S.1981, § 78; 20 O.S.1981, § 3001.1; and, Utica National Bank & Trust v. Assoc. Prod. and City of Lawton, 622 P.2d 1061 (Okla.1981).